T.C. Memo. 2017-138

UNITED STATES TAX COURT

DONALD J. BUCKREY, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15620-09, 16566-09,         Filed July 11, 2017.
16567-09.

Ps were the sole owners of a corporation (C). C partially redeemed Ps' shares for its liquid noncash assets and then sold all its operating assets, which generated a large tax liability. Ps entered into a Midco transaction with (M), whereby C transferred its cash to M and a subsidiary of M (S) purchased Ps' shares of C. R was unable to collect C's large tax liability from M or S and decided to hold Ps liable as transferees of C. R sent Ps notices of liability, arguing that the entire series of transactions lacked economic substance. Ps assert that they are not liable under Minnesota fraudulent-transfer law, the governing state law.

[1] The other cases that we consolidated with this one are Richard Nyberg, Transferee, docket No. 16566-09; and Robert Pribyl, Transferee, docket No. 16567-09.

**[*2]**  Held:  Under I.R.C. sec. 6901, the question of whether we can or must recast a series of transactions is a question of state fraudulent-transfer law.

Held, further, the partial stock redemption cannot be combined with the later distribution under Minnesota law, and the Minnesota Uniform Fraudulent Transfer Act does not apply to the stock redemption.

Held, further, Minnesota law requires a transfer-by-transfer analysis and does not allow us to collapse the transactions under a substance-over-form analysis.

Held, further, Ps did not receive a transfer directly from C because, even though C and M had commingled their funds for a brief time, the escrow agent had a contractual duty to deliver the specific funds from each party.

Held, further, there is a material fact in dispute as to whether S borrowed funds from M to purchase the shares or whether M paid for them directly, which precludes summary judgment on R's transferee-of-a-transferee and for-the-benefit-of theories.

Held, further, there is a material fact in dispute as to whether Ps actually intended to defraud R.

Held, further, Ps are not liable to R under the Minnesota Business Corporations Act because they did not receive a liquidating distribution from C.


Sue Ann Nelson, Masha M. Yevzelman, and Emily M. Chad, for petitioners.

Blaine Charles Holiday and John Schmittdiel, for respondent.

**[*3]** MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  After selling the assets of their business, Donald Buckrey, Richard Nyberg, and Robert Pribyl found themselves the owners of a corporation that had lots of cash, a sizable tax liability, and nothing else.  They were approached by an all-too-familiar character in Tax Court caselaw--MidCoast.  MidCoast offered them more for their company than what they would otherwise have received if they had simply liquidated it and divided what was left after taxes.

Background

The parties filed a lengthy (1,402 pages to be exact) stipulation of facts to accompany their cross-motions for summary judgment.  We draw our discussion of the background facts from this comprehensive stipulation and its many exhibits, and rely solely on the facts as agreed.

I.      The Stock Redemption and the Stock Sale

Buckrey, Nyberg, and Pribyl (the shareholders), and a man named John Hays incorporated BHNP Acquisition Company in Minnesota in 1994.  They did so to buy the business assets of a company that manufactured gears and broaches[2]

---

[2] A broaching machine is a tool that cuts different materials into a desired shape.  The broach is the cutting tool that is at the heart of a broaching machine.  It

(continued...)

**[*4]** and had the uninspired name of Gear & Broach, Inc. After the acquisition, BHNP changed its name back to Gear & Broach, Inc. None of the shareholders had a four-year college degree, but they knew their business. The shareholders operated the company successfully for ten years, and revenues grew from $1 million to $20 million by 2003. Hays enjoyed this success too but was bought out in 2003. He remained as a consultant.

After a decade spent forging this success, the shareholders decided to see if they could sell. Buckrey went to a seminar on how to sell a business hosted by the Geneva Companies, Inc. The shareholders together retained Geneva and its representative Ted Polk to search for buyers. The mission was a success, and the company sold its gear-manufacturing assets to FastenTech, Inc., through a newly formed subsidiary of FastenTech called Gear & Broach (DE), Inc. (a Delaware corporation). The shareholders hired Arthur Dickinson and Yuri Berndt from a Minneapolis law firm as well as Mark Harrington from a local accounting firm to help them. They closed the sale in March 2004.

---

[2](...continued)
has many teeth to cut the material, and each tooth is slightly larger than the one before it. Broaches comes in many different shapes and sizes.

[*5]   Before the closing Polk contacted Dickinson about the shareholders' selling their stock to MidCoast Investments, Inc.  Dickinson and Berndt told the shareholders about this opportunity, and the attorneys received a letter from MidCoast later that month.  In it was a promise to pay a premium for the stock and a claim that MidCoast was in the "asset recovery" business, which could somehow make the company a profitable acquisition.  Dickinson and Berndt reviewed the terms of this letter with an eye to its tax consequences to their clients.  Buckrey became the contact for the shareholders, and Dickinson sent him a copy of MidCoast's letter to review.  After some revisions the shareholders countersigned a letter of intent in March 2004.

Berndt sent MidCoast a list of due-diligence requests that included:

- Independent references regarding MidCoast's financial capabilities, including banking and credit references;

- a list of references of attorneys or accountants who had previously worked with MidCoast and who had evaluated a transaction similar to this one;

- a list of the principals, officers, and directors of MidCoast Investments, Inc., and its parent companies;

- evidence as to the source of the funds to be used in the purchase; and

- names of affiliated operating companies related to MidCoast.

**[*6]** The record reveals that MidCoast did provide references, but it doesn't reveal whether MidCoast provided answers to the other questions. Berndt called the references and got no negative comments about MidCoast. Berndt also had a paralegal look up some UCC filings for MidCoast, and a firm librarian researched some publicly available information and articles about MidCoast.

MidCoast itself retained Thomas Doyle of another Minneapolis law firm to assist in the acquisition. MidCoast's subsidiary, MidCoast Acquisitions Corp., formed another subsidiary, BNP, LLC, to acquire the stock from the shareholders. MidCoast Acquisitions was BNP, LLC's sole member. At the request of MidCoast the shareholders changed the name of their company to BNP of Minnesota, Inc. (though we'll call it just BNP from now on). MidCoast was only interested in acquiring a company that held nothing but cash and tax liabilities, so the shareholders had to redeem a portion of their stock, which they did on May 19, 2004. This redemption caused BNP to distribute all its remaining noncash assets-- accounts receivable from the three owners, tax refunds, prepaid insurance refunds, and future cash from FastenTech from the earlier asset sale--to the shareholders in redemption of approximately 36% of their total shares.

BNP now had only cash and a tax liability--specifically, approximately $3.7 million in cash and a tax liability of approximately $1.5 million from the asset

[*7] sale. The magic could begin. On the same day as the redemption, the shareholders and a representative of MidCoast entered into a share-purchase agreement in which BNP, LLC, promised to pay nearly $2.7 million for the shareholders' remaining BNP stock. This price was a more than $500,000 premium over what the shareholders would have received in a simple liquidation of BNP.[3]

The purchase agreement was executed by BNP, LLC; BNP; and the shareholders. MidCoast Credit Corp.--yet another MidCoast affiliate--was also a party, and it guaranteed that the purchase price would be paid. The agreement said that BNP, LLC, would buy the shares by wiring the purchase price according to the instructions set out in a separate closing agreement. The agreement also said that BNP would deliver all its cash to BNP, LLC. By its terms, all of the events at closing would be deemed to occur simultaneously. This is what would happen:

---

[3] In a liquidation, the shareholders would walk away with only around $2.2 million, because the asset sale to FastenTech generated a large taxable gain at the corporate level. The shareholders could have waited until this liability matured and had BNP pay it before liquidation, or they could have liquidated immediately and taken the $3.7 million in cash. If they chose the second option, they would be personally liable for the corporate tax on the asset sale, so either way they would end up with only around $2.2 million.

[*8]  •  First, BNP would transfer its funds to a general escrow account, opened by agreement among BNP, another firm named Morehead Capital, LLC,[4] and Associated Bank Minnesota.

•  Second, once MidCoast's counsel received confirmation that BNP made this transfer, funds in the amount of the purchase price would be wired to the same account. (The memo was silent as to who exactly would be wiring these funds.)

•  Third, once the escrow account held both amounts, the escrow agent would transfer the cash that came from BNP to BNP, LLC's lender's counsel. This "lender" was defined to be MidCoast Investments, Inc.

•  Fourth, the escrow agent would wire some of the remaining money (i.e., the purchase price) to a couple other escrow accounts. These were known as the "holdback escrow account" and the "tail escrow account."

•  Finally, once all this was done (which, in reality, could be accomplished in minutes), the balance of the money was to be wired to the shareholders.

The escrow agent was Associated Bank Minnesota, and all three escrow accounts were held there. The parties signed three separate escrow agreements to create the three escrow accounts. The general escrow account was the main account used to facilitate the transaction. The tail escrow account held $30,000 to

---

[4] This appears to be a typo. The closing memorandum refers to the escrow agreements, which were executed separately. The general escrow agreement was between BNP, Associated Bank, and MidCoast Investments, Inc. Morehead was not a party to it but was also not simply a name out of the blue. As we explain below, Morehead was an integral part of the post-stock-sale transactions that MidCoast used to "eliminate" the taxes from the asset sale.

[*9] cover any insurance premiums on policies for BNP's discontinued operations. As of the date of the audit, the $30,000 was still in this account. The holdback escrow account was created as insurance for MidCoast. The agreement required that $350,000 of the purchase price be placed into this holdback escrow account in case BNP (which at this point would be owned by BNP, LLC) was required to pay FastenTech a working-capital adjustment under the terms of the earlier asset sale. The escrow agreement stated that any working-capital adjustments would be reimbursed up to the $350,000, and if there was anything left, the remainder would go to the shareholders. (The shareholders later got the full $350,000 after FastenTech said that it needed no adjustments.)

Each escrow agreement laid out the responsibilities of Associated Bank. The Bank's responsibilities were quite simple: It had to hold the money that it received from BNP and MidCoast and send it on according to the precise instructions we've already described.

The transfers were all uneventful. BNP wired its entire cash reserve of more than $3.7 million to the escrow account. Once the money was there, MidCoast Investments, Inc., wired the purchase price of a bit more than $2.7 million to the same escrow account. These funds came from MidCoast Investments' SunTrust Bank operating account. On the following day the escrow

[*10] agent wired the $3.7 million received from BNP to the same MidCoast Investments operating account with SunTrust Bank. The escrow agent also wired $30,000 to the tail escrow account, $350,000 to the holdback escrow account, and the remainder to the shareholders.

The purchase agreement contained a few other noteworthy terms. BNP, LLC, warranted it would maintain the legal existence of BNP for three years and promised to "conduct[] operations" during that time. The agreement also stated that BNP, LLC, would file BNP's "state and federal income tax returns for [BNP's] fiscal year ended August 31, 2004 and [pay] the federal and state income taxes, *if any*, attributable thereto." (Note that BNP, LLC, did *not* specifically promise to pay the tax liability that arose as a result of the asset sale to FastenTech, but only the tax liability attributable to BNP's tax returns for 2004.)

II.     MidCoast's Post-Sale Transfers

The shareholders then made their exit, but the story was far from over. MidCoast Acquisitions executed an agreement to sell its interest in BNP, LLC (which now owned BNP), to Morehead Capital, LLC, on the same day it received the $3.7 million in its operating account. The sum of $3.7 million was withdrawn from MidCoast Investments' SunTrust Bank operating account on this date. After this sale BNP, LLC, had BNP participate in some sort of binary- or digital-option

**[*11]** transactions and interest-rate swaps in June 2004. The purpose of these swaps presumably was to generate losses in a Son-of-BOSS fashion.[5] In June 2004 Morehead sold BNP, LLC, to Sequoia Capital, LLC. A little over a week later Sequoia contributed its interest in BNP, LLC, to yet another entity. No party disputes that the transactions occurring after the shareholders' sale of BNP to MidCoast were part of a scheme to generate illegitimate losses. To this very limited extent, the scheme worked and when BNP did file a 2004 tax return, it offset the income from the FastenTech purchase with them.

III.    Midco Transactions

Midco/Intermediary transactions aim at one goal--to allow buyers and sellers of corporations to eat their cake and have it too. In a normal scenario (such as that faced by the shareholders here), the owners of a corporation that want to sell their company would prefer to do so by a stock sale. By structuring it this way, shareholders would likely have a capital gain, and any built-in gains in the

---

[5] Son-of-BOSS deals were generally used to artificially inflate someone's basis in a partnership interest by contributing assets with large contingent liabilities (which were ignored in computing basis) and then selling this interest at fair market value for a huge tax (but no economic) loss. See, e.g., RJT Invs. X v. Commissioner, 491 F.3d 732 (8th Cir. 2007) (involving typical Son-of-BOSS transaction); Kligfeld Holdings v. Commissioner, 128 T.C. 192 (2007). There are other variations, see, e.g., Home Concrete & Supply, LLC v. United States, 634 F.3d 249 (4th Cir. 2011). We've never found a Son-of-BOSS transaction that worked.

[*12] corporation's assets would be the problem of the new owners, who don't get a step-up in basis in those assets by buying stock. But both parties to such a deal know the rules, which means that the stock price should reflect those built-in gains and future tax bill. Still, in our fallen world of nonzero-transaction costs and less-than-perfect information, a future tax bill of uncertain size means that stock sales are usually preferred by sellers of firms, and asset purchases by their buyers. That was certainly true of the shareholders here. By agreeing to an asset sale, they were left with a corporation that was a shell full of cash. The corporation had large gains from the sale of its assets, and it would have to pay taxes on those gains. The shareholders would get whatever's left over in liquidation of their shares, and they would likely have to pay tax on the gain from the sale of their stock too.

Midco transactions generally occur in one of two ways, and both result in effectively the same outcome. The first structure is explained in Notice 2001-16, 2001-1 C.B. 730, and occurs when the owners of a cash-filled shell sell their stock to an intermediary company.[6] This company (the Midco) pays a premium over the after-tax, post-liquidation value of the shares. The Midco then sells the assets of the company to the real intended buyer, thus triggering the built-in gain and giving

_____

[6] See, e.g., Swords Tr. v. Commissioner, 142 T.C. 317 (2014); Diebold Found., Inc. v. Commissioner, 736 F.3d 172, 184-85 (2d Cir. 2013), vacating and remanding sub nom. Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-61.

**[*13]** the buyer a step-up in basis. The cash that the Midco receives is usually paid to another entity that lent it the money to purchase the shares in the first place. Of course, there is some difference between the price it pays for the shares and the money it receives in the asset sale--the Midco has to generate some profit after all. But the elephant in the room can't hide any longer--the asset sale generated a large taxable gain, and the Midco is responsible for it. The Midco usually claims offsetting tax attributes or tax-exempt status. These claims are very often found to be fruitless, but the company is usually a recently formed entity without any other assets and is thus judgment-proof.

The other variant of the transaction reverses the sequence and begins with an asset sale followed by a stock sale.[7] The sellers sell the assets in the company and are left with a pile of cash, a corporate shell, and a large corporate-tax liability. At this point, the Midco offers the shareholders a premium on their shares that they wouldn't otherwise get. After the sale of the stock, the Midco now owns the corporate shell, its cash, and its tax liability. In some form or fashion, the Midco withdraws the cash from the corporation and disappears, leaving a large unpaid tax bill. Just as in the first scenario, the Midco is usually

---

[7] See, e.g., <u>Sawyer Tr. of May 1992 v. Commissioner</u>, T.C. Memo. 2014-59.

**[\*14]** newly formed (often in a tax-haven jurisdiction) and is both judgment-proof and hard to find.[8]

The big loser in all of this is the IRS. It does not take this loss well, and has for years gone after the other parties involved to try to collect what can be a substantial tax bill.

IV.    IRS Audit of BNP, LLC

The IRS audited BNPs 2004 tax return and issued a notice of deficiency, which it mailed to the company's address in February 2008. The IRS then issued 30-day letters[9] to each of the three shareholders only four days later. These letters were the first step by the Commissioner to collect BNP's tax liability from them. In his letter the Commissioner proposed a transferee-liability assessment of more

---

[8] The principals involved in several Midco transactions did not manage to disappear, but instead were indicted for conspiracy to defraud the government and obstruct the administration of tax law. See United States v. Veera, No. 2:12-cr-00444-BMS (E.D. Pa. filed June 20, 2012).

[9] After an IRS examiner concludes an audit and determines there is something off with a return, he sends the taxpayer a 30-day letter to describe his findings. The taxpayer has thirty days to request a conference with the IRS Appeals Office if he disagrees. If the taxpayer does nothing, the IRS will then send him a notice of deficiency. Sec. 601.105(d)(1)(iv), Statement of Procedural Rules; see also Estate of Gillespie v. Commissioner, 103 T.C. 395, 395 n.3 (1994), superseded by statute, Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, sec. 3101(b), 112 Stat. at 728, as recognized in Fla. Country Clubs, Inc. v. Commissioner, 122 T.C. 73 (2004), aff'd, 404 F.3d 1291 (11th Cir. 2005).

**[*15]** than $1.1 million plus interest and penalties against each shareholder. He

did so under the authority of section 6901.[10] This amount represented the federal

tax liabilities generated by BNP's asset sale to FastenTech. The shareholders

timely filed administrative appeals, which were denied. They then timely filed

petitions with this Court to contest the proposed assessment of transferee liability.

At the time the shareholders filed the petitions, Buckrey resided in Florida and

Nyberg and Pribyl resided in Minnesota.[11]

---

[10] All section references are to the Internal Revenue Code in effect for the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[11] Appellate venue of a Tax Court decision is defined by section 7482. In the case of a "redetermination of tax liability" for an individual, appeal lies to the circuit in which the taxpayer resided when he filed the petition. Sec. 7482(b)(1)(A). The Code doesn't address what happens when there are multiple taxpayers and they do not all reside in the same circuit. Caselaw tells us that in such cases taxpayers can appeal our decision to their different circuits or stay together with one appeal in any of the circuits in which one of them resided. See Estate of Israel v. Commissioner, 159 F.3d 593, 595-96 (D.C. Cir. 1998), rev'g and remanding 108 T.C. 208 (1997).

But we have a possible problem here. No one disputes BNP's deficiency, yet the shareholders in these cases did not receive notices of deficiency, they received notices of *liability*. It's entirely about whether the shareholders should be held liable for BNP's tax bill. This means there is a question about whether their cases really seek a "redetermination of tax liability." Sec. 7482(b)(1)(A).

We haven't found a case directly addressing appellate venue for transferee-liability cases where the underlying amount of tax isn't in dispute. But the appellate-venue provisions of section 7482(b)(1)(A) have at least been implicitly applied to other very similar Midco cases before. See Slone v. Commissioner, 810

(continued...)

**[*16]** The parties filed a first stipulation of facts in June 2014.  Both then moved for summary judgment, and we held a hearing on the cross-motions in June 2015.  We allowed the parties to file supplemental memoranda of law in support of their motions after this hearing, and both took advantage of this opportunity.  Today we rule on these motions.

---

[11](...continued)
F.3d 599, 604 (9th Cir. 2015), vacating and remanding T.C. Memo. 2012-57; Swords Tr. v. Commissioner, 114 A.F.T.R.2d (RIA) 2014-7003 (6th Cir. 2014) (venue proper in both Sixth and Fourth Circuits, but transferring case to Fourth Circuit); Sawyer Tr. of May 1992 v. Commissioner, 712 F.3d 597, 604 (1st Cir. 2013) ("The IRS filed a timely petition for review in this circuit, where venue is proper.  See 26 U.S.C. § 7482(b)(1)."), rev'g and remanding T.C. Memo. 2011-298.  But see Byers v. Commissioner, 740 F.3d 668, 675-76 (D.C. Cir. 2014) (holding that appellate venue for CDP cases not challenging the underlying tax liability was only proper in that circuit).

Commentators have proposed multiple theories for appellate venue in transferee-liability cases.  One such theory is that "redetermination of tax liability" includes our jurisdiction at the time the Code was amended in 1966, which included both deficiency and transferee cases.  Another theory is that the phrase includes only deficiency cases, which would make transferee cases appealable only to the D.C. Circuit.  See James Bamberg, "A Different Point of Venue:  The Plainer Meaning of Section 7482(b)(1)," 61 Tax Law. 445, 461-62 (2008).  The IRS agrees with the former.  See Chief Counsel Notice CC-2015-006 (June 30, 2015).

We note this issue because appellate venue sometimes affects our analysis:  Different circuits sometimes apply different legal analyses, and appellate venue dictates which circuit's law, if any, we must apply.  Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).  At this stage of this case, however, we think it is immaterial because the analysis conducted today focuses on Minnesota law, which should be the same in each circuit.

**[*17]**                                   Discussion

I.      Standard of Review

We may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law.  Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).  After the moving party submits a proper summary-judgment motion, the nonmoving party cannot rest on allegations or denials in his pleadings, but must present specific facts showing that there is a genuine dispute for trial. Rule 121(d); Dahlstrom v. Commissioner, 85 T.C. 812, 820-21 (1985).  When there are cross-motions for summary judgment, both parties must still prove there is no genuine dispute of material fact to win.

II.     Transferee Liability

Rules making some transfers voidable are necessary for advanced credit markets.  Without them, pawn shops and loan sharks would be the only credit sources because a debtor who kept possession of his assets could give them to family or friends, and make himself judgment-proof.  Fraudulent-transfer laws have developed over the centuries to protect creditors and credit markets.[12]

---

[12] The first such law in our legal tradition dates to 1571, when Parliament made it illegal to transfer property to hinder, delay, or defraud creditors.  Even

(continued...)

[*18] Many states have adopted a uniform law--in Minnesota called the Minnesota Uniform Fraudulent Transfer Act (MUFTA)--to solve this problem. The MUFTA defines those transfers deemed to be fraudulent and gives remedies to creditors. The Act defines "creditor" to mean "a person who has a claim." Minn. Stat. Ann. sec. 513.41(4) (West Supp. 2017). It broadly defines "claim" to include rights to payments that are "contingent". Minn. Stat. Ann. sec. 513.41(3) (West Supp. 2017). If a transaction occurs before year-end (as was the case here with the asset sale to FastenTech), it may have tax consequences, but the exact amount and nature of those consequences can't be determined until the end of the year--a taxpayer might, for example, have legitimate deductions that can offset the income from the earlier transfer. A federal income-tax liability is thus--to use the

---

[12](...continued)
back then, fraudulent-transfer laws were connected to tax law--one-half of the property fraudulently conveyed would be forfeited to the Crown. See Douglas G. Baird & Thomas H. Jackson, "Fraudulent Conveyance Law and Its Proper Domain," 38 Vand. L. Rev. 829 (1985).

Twyne's case, 76 Eng. Rep. 809, 3 Co. Rep. 80 b (Star Chamber 1601), showed the problem. Pierce, a sheep farmer, owed money to Twyne and another creditor. The other creditor recruited the sheriff to collect his money but, just before the sheriff arrived, Pierce deeded all his sheep to Twyne though he continued to keep and treat them as his own. The other creditor sued, and the Star Chamber found the transfer to be fraudulent. It based its decision on six indicia of fraud--laying the foundation of what we now call "badges" of fraud. See Stephen P. Harbeck, "Twyne's Case Retold: Still Good Law Four Hundred Years Later," 4 Mountbatten Journal of Legal Studies 65, 65-69 (2000).

**[\*19]** terms of fraudulent-transfer law--"contingent" until the end of the year. See, e.g., Espinosa v. Commissioner, 24 F. App'x 825, 826 (9th Cir. 2001) (noting that tax liability becomes "fixed at the close of the tax years in question"), aff'g T.C. Memo. 2000-66. The parties agree that although the Commissioner's claim here was contingent, it's nonetheless a claim under MUFTA, even if the tax liability isn't fixed at the time a possibly fraudulent transfer occurred. See, e.g., Scott v. Commissioner, 117 F.2d 36, 38 (8th Cir. 1941); Stuart v. Commissioner, 144 T.C. 235 (2015), vacated and remanded, 841 F.3d 777 (8th Cir. 2016).[13]

The IRS can collect on fraudulent transfers under section 6901. Section 6901(a)(1) provides that the liability, at law or in equity, of a transferee "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." The Code defines the term "transferee" broadly, including "donee, heir, legatee, devisee, and distributee." Sec. 6901(h).

A transferee liable under section 6901 can also be liable for the taxpayer's penalties and interest. See Kreps v. Commissioner, 42 T.C. 660, 670 (1964), aff'd, 351 F.2d 1 (2d Cir. 1965). But the transferee can be liable for the penalties of the

---

[13] The parties do not agree that the possible liability of the shareholders for penalties is a claim under MUFTA.

**[\*20]** taxpayer only if the Commissioner proves "that the transfer was made with intent to defraud future creditors." Sawyer Tr. of May 1992 v. Commissioner, T.C. Memo. 2014-128, at \*11 (quoting Stanko v. Commissioner, 209 F.3d 1082, 1088 (8th Cir. 2000), rev'g T.C. Memo. 1996-530).[14] Transferee liability under section 6901 is also several, which means that the Commissioner is free to go after any of the potential transferees for the entire amount. Phillips v. Commissioner, 283 U.S. 589, 603-04 (1931).

III. Proper Analysis Under Section 6901

Section 6901 provides a mechanism for the IRS to hold transferees liable for the unpaid taxes of a transferor. But note that this section provides a procedure only for collection--it does not create a rule that defines substantive liability. Commissioner v. Stern, 357 U.S. 39, 42 (1958). The Supreme Court in Stern made clear that section 6901's predecessor (nearly identical to the current section 6901) gave the IRS the ability to collect from transferees under federal law, but only if their actions would make them liable as fraudulent transferees under state

---

[14] The Eighth Circuit reasoned in Stanko that "penalties for negligent or intentional misconduct by the transferor that occurred many months after the transfer, \* \* \* are not, by any stretch of the imagination, existing at the time of the transfer." Stanko, 209 F.3d at 1088. Relying on this opinion, we held in Frank Sawyer Trust, another Midco case, that the Commissioner hadn't proved the transfers were made with the intent to defraud future creditors, and therefore, couldn't hold the taxpayers liable for the transferor's penalties.

**[\*21]** law. Id. at 45. The Court effectively created a two-part test, in one part of which we ask whether the taxpayers are "transferees" under federal law and in the other we ask whether their transaction was a fraudulent transfer under state law. As applied here, this means we ask: Are the shareholders "transferees"?--a federal question; and were the transactions by which they received cash for their shares a fraudulent transfer under Minnesota law?--a state question.

We must be constantly aware in this context that the Code places the IRS on a par with other unsecured creditors, and does not give it greater rights. Id. at 47 (Government's rights precisely those of other creditors). The Commissioner argues that we should follow a different two-step analysis, starting with the question of whether there was a fraudulent transfer: He urges us to apply federal tax-law standards to determine if all the transactions that led to the shareholders' getting money for their shares and BNP moving to BNP, LLC should be collapsed and characterized as a liquidating distribution directly from BNP to its shareholders. After conducting this analysis (and in the IRS's mind finding that the transactions are really a liquidating distribution due to substance-over-form doctrines), we would then determine if the transfer was fraudulent as a matter of state law.

**[\*22]** We have repeatedly rejected this argument. See, e.g., Stuart, 144 T.C. at

253-56; Swords Tr. v. Commissioner, 142 T.C. 317, 338 (2014). Three circuits

have agreed with us and also rejected this argument. We will continue to hold that

under section 6901 the question of whether we can or must recast a series of

transactions is a question of state fraudulent-transfer law. See Salus Mundi

Found. v. Commissioner, 776 F.3d 1010 (9th Cir. 2014), rev'g and remanding T.C.

Memo. 2012-61; Diebold Found., Inc. v. Commissioner, 736 F.3d 172, 184-85 (2d

Cir. 2013), vacating and remanding Salus Mundi Found. v. Commissioner, T.C.

Memo. 2012-61; Sawyer Tr. of May 1992 v. Commissioner, 712 F.3d 597, 604-

605 (1st Cir. 2013), rev'g T.C. Memo. 2011-298; Starnes v. Commissioner, 680

F.3d 417, 428-29 (4th Cir. 2012), aff'g T.C. Memo. 2011-63. We do note that the

Commissioner has reserved this argument. But we also remember that the Stern

test is a two-part test. We can start with either part, and the Commissioner must

pass both to win. See, e.g., Slone v. Commissioner, 810 F.3d 599, 608 (9th Cir.

2015) ("[T]he tax court may begin its analysis with either prong."); Diebold

Found., 736 F.3d at 185-86; Starnes, 680 F.3d at 427.

    We'll start with state law.

**[*23]** IV.    The Minnesota Fraudulent Transfer Statutes

Minnesota adopted the Uniform Fraudulent Transfer Act, and later amended and retitled it as the Uniform Voidable Transactions Act.  Minn. Stat. Ann. secs. 513.41-513.51 (West Supp. 2017).  The statutes provide creditors with remedies, including the avoidance of fraudulent transfers.  Id. sec. 513.47.  A creditor can recover judgment for the value of the property transferred or the amount of the creditor's claim, whichever is less.  Id. sec. 513.48(b)(1).  The judgment may be entered against either (1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good-faith transferee who took for value.  Id. sec. 513.48(b)(1)-(2).

Fraudulent transfers generally fall into three categories:

- A transfer is *actually* fraudulent as to any creditor if the debtor transferred the property "with actual intent to hinder, delay, or defraud" the creditor.  Id. sec. 513.44(a)(1).

- A transfer is *constructively* fraudulent as to *present* creditors if the debtor made the transfer "without receiving a reasonably equivalent value in exchange * * * *and* the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation."  Id. sec. 513.45(a) (emphasis added).

- A transfer is fraudulent to present *and future* creditors if the debtor made the transfer "without receiving reasonably equivalent value in exchange" *and*:

**[*24]** •   was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; *or*

•   intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Id. sec. 513.44(a)(2)(i)-(ii).

V.   Summary of Arguments

The Commissioner wants to hold the shareholders liable for all of the taxes that were due from BNP on the sale of the assets to FastenTech, plus penalties and interest. He argues that the partial stock redemption and the subsequent stock sale should be considered a single transaction that was effectively just a liquidation of the shareholders' BNP stock. The Commissioner believes that even if we can't use federal substance-over-form principles to do this, Minnesota also provides for these principles of equity to view the transaction in its substance.

The Commissioner also offers (albeit very briefly) two alternative fraudulent-transfer theories. The first is that the shareholders are liable as transferees of a transferee of BNP. The Commissioner argues that the transfer by BNP of its remaining cash to MidCoast "was fraudulent making [the IRS] a creditor of MidCoast." Once the IRS is deemed a creditor of MidCoast, the

[*25] transfer of cash from MidCoast to the shareholders "was also fraudulent and thus [the IRS], being a creditor of MidCoast, became a creditor of [the shareholders]." The second is that the shareholders are liable as people for whose benefit the fraudulent transfer was made, even if they never actually received anything from BNP. The Commissioner argues that "MidCoast Investments would not have transferred cash to [the shareholders] without receiving [BNP's] cash. [The Shareholders] received an actual benefit from the transfer to MidCoast Investments by receiving a premium stock purchase price * * *."

The Commissioner also makes another state-law argument. He contends that the shareholders are liable under the Minnesota Business Corporations Act (MBCA)--in their capacity as directors for making illegal distributions; and for having received transfers from BNP as part of its dissolution before BNP paid off its creditors.

The shareholders contend that they never received a distribution from BNP, at least a distribution that was governed by MUFTA. They also assert that BNP wasn't rendered insolvent as a result of any of the transfers because the money originally left in the BNP shell remained with it throughout the process. In answer to the Commissioner's alternative arguments, the shareholders say they can't be transferees of a transferee because this theory requires two separate fraudulent

[*26] transfers. The second transfer, from MidCoast to the shareholders, wasn't fraudulent because MidCoast was still solvent. The shareholders also believe the Commissioner's reading of the "for the benefit of" provision of MUFTA is too broad and that there is no undisputed evidence that MidCoast wouldn't have transferred the purchase price to the shareholders but for BNP's transfer of cash to the MidCoast operating account.

The shareholders respond to the Commissioner's MBCA liability arguments by pointing out that they can be liable as directors only if they made "illegal distributions." And, even if any alleged distributions were illegal, the directors can be liable only to the corporation, its shareholders, or a corporate receiver. They also argue that no dissolution ever took place, so that theory of liability won't work either.

We address these issues in the following order:

- Can the transactions be combined under Minnesota law?

- Did the shareholders receive a transfer from BNP (other than the partial stock redemption) through commingling in the erroneous accounts?

- Were the shareholders transferees of a transferee of MidCoast?

- Were the transfers from BNP made for the shareholders' benefit?

[*27] •    Did the shareholders have actual fraudulent intent?

•    Do the provisions of the MBCA make the shareholders liable?

A.    Combining the Stock Redemption and Later Sale

The Commissioner first argues that we should combine the partial redemption of shares with the later stock sale and treat the whole deal as a liquidation of BNP. He relies on general equitable principles of substance over form and urges us to focus on the fact that the redemption occurred only two days before the stock sale and with full knowledge that it would happen. The shareholders don't dispute the timing, but rely heavily on the Commissioner's stipulation that BNP was still solvent after the redemption and before the stock sale to avoid any combination of the redemption and sale.

The Commissioner starts by pointing us to Minnesota tax law, and there are Minnesota cases that apply substance-over-form principles to recharacterize a transaction. In Cmty. Hosp. Linen Servs., Inc. v. Comm'r of Taxation, 245 N.W.2d 190 (Minn. 1976), the Supreme Court of Minnesota affirmed a Minnesota Tax Court decision to apply a property-tax exemption to a group of hospitals even though the hospitals owned the property through separate nonprofit entities. In Anderson v. Comm'r of Taxation, 93 N.W.2d 523 (Minn. 1958), the Minnesota Supreme Court used equitable principles to determine whether a distribution was

**[*28]** in effect a taxable dividend or return of capital.  See also <u>Midwest Fed. Sav.
& Loan Ass'n v. Comm'r of Revenue</u>, 259 N.W.2d 596, 599 (Minn. 1977)

(applying substance-over-form principles to determine if an arrangement was a

truly a sale and leaseback or a loan); <u>Bartz v. Comm'r of Taxation</u>, 1976 WL 891,

at *4 (Minn. Tax Court 1976) (using substance-over-form principles to determine

if the taxpayer was in control of a corporation).

These cases do apply a substance-over-form analysis.  But they are

Minnesota *tax* cases.  <u>Cmty. Hosp.</u>, 245 N.W.2d at 195 ("[I]t was in substance and

form a separate legal entity and could not disavow that fact *for tax purposes*."

(Emphasis added.)); <u>Midwest Fed. Sav.</u>, 259 N.W.2d at 599 ("We agree that *on tax

questions* a court is free to look to the substance, not just the form, of a

transaction." (Emphasis added.)); <u>Bartz</u>, 1976 WL 891, at *4 ("[I]t is a general

principle of *tax law* that substance, rather than form, is the controlling factor in

determining proper tax treatment." (Emphasis added.)).  The problem for the

Commissioner is that although we are the United States Tax Court, this particular

issue isn't a question of tax law but a question of Minnesota fraudulent-transfer

law.[15]

---

[15] The Commissioner even admits that he "is not seeking to apply Minnesota
state tax law.  Rather [he] is seeking to collect a debt * * * .  Accordingly, support

(continued...)

**[*29]** These cases might be useful in determining how a Minnesota court would rule in this the absence of other authority--but that's not what we have here: The Minnesota Supreme Court recently decided <u>Finn v. Alliance Bank</u>, 860 N.W.2d 638 (Minn. 2015). The dispute in <u>Finn</u> was whether Minnesota should

---

[15](...continued)
for [the Commissioner's] recasting of the transactions between [the shareholders] and MidCoast should be derived from state transferee liability cases, or other creditors' rights laws, not state tax law cases."

The Commissioner does argue that these principles apply statutorily to MUFTA. He cites Minn. Stat. section 513.50. This section states that unless they've been specifically excluded in the other sections of MUFTA, "the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement [MUFTA's] provisions." Minn. Stat. Ann. sec. 513.50 (West 2014). The shareholders counter with *ejusdem generis*. This is the canon of statutory construction that says when general words follow more specific ones, the general terms will be limited to things in the same class as the specific ones. <u>See, e.g.</u>, <u>Argo-Jal Farming Enters., Inc. v. Commissioner</u>, 145 T.C. 145, 154 (2015). Under this logic, the shareholders argue that substance over form doesn't belong to the same class as the law of merchant, principal and agent, etc. Because we find that we can't recast the transactions for other reasons described below, we needn't decide this question.

**[\*30]** adopt a Ponzi scheme presumption[16] for fraudulent-transfer questions.  The court reasoned:

> [T]he focus of [MUFTA] is on individual transfers, rather than a pattern of transactions that are part of a greater scheme.  MUFTA's emphasis on individual transactions finds support in the definition of the word transfer, which refers to every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with *an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance. The asset-by-asset and transfer-by-transfer nature of the inquiry under MUFTA requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer.

Finn, 860 N.W.2d at 647 (internal citations omitted).

Finn, unlike the other cases that the Commissioner cites, specifically addresses MUFTA.  Its language is broad and has large implications.  A federal bankruptcy court has already noted this.  Kelley v. Opportunity Fin., LLC (In re Petters Co.), 532 B.R. 100, 121 n.33 (D. Minn. 2015) ("The Finn court defined the remedy with a tight, textually-based focus * * *.  Whatever the merits of that

---

[16] This presumption lets creditors prove certain elements of a fraudulent transfer by showing a debtor was operating a Ponzi scheme.  If a creditor can show a debtor's actions were in furtherance of the scheme, it will be presumed that he had actual fraudulent intent, see Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008), was insolvent at the time he made any transfers in furtherance of the scheme, and did not receive reasonably equivalent value in exchange for them. (The latter two can help show constructive fraud.  See, e.g., Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006)).

[*31] outcome, the court was unequivocal in identifying the necessary target of avoidance under MUFTA, as *individual transfers of assets*.  That recognition has larger implications that cannot be gainsaid").  In light of Finn's language, we're left to conclude that we must examine the stock redemption and stock sale-- indeed, even the transactions that accompanied the stock sale on May 21, 2004-- transfer-by-transfer.  The Commissioner's argument in favor of reading state law to allow the collapse of multiple transactions into one must fail.

Once we look at the stock redemption and the later stock sale as distinct transactions, the strength of the shareholders' position becomes clearer.  Let's look at the redemption first.  Minnesota law expressly defines a corporation's redemption of stock as a form of corporate distribution.  "A distribution may be in the form of a * * * redemption".  Minn. Stat. Ann. sec. 302A.011 subdiv. 10 (West Supp. 2017).  The redemption here falls within this definition, and the parties don't dispute this.  When a Minnesota corporation makes a distribution, the MBCA supersedes all other Minnesota statutes.  See Minn. Stat. Ann. sec. 302A.551 subdiv. 3(d) (West Supp. 2011).  The MBCA specifically displaces normal rules of fraudulent transfers:  "[T]he provisions of sections 513.41 to 513.51 [(the MUFTA)] do not apply to distributions made by a corporation".  Id.

**[\*32]** The Commissioner urges us to ignore this plain language by citing McGraw v. Commissioner, 384 F.3d 965 (8th Cir. 2004), aff'g on other grounds Butler v. Commissioner, T.C. Memo. 2002-314, 2002 WL 31882859.[17]  The Eighth Circuit in McGraw did note that this provision appears to be inconsistent with the purpose of MUFTA to provide outside creditors with remedies.  That court also cited some Minnesota commentators who argue the plain language doesn't mean what it says.[18]  Id.  But McGraw, though highlighting a possible difference between the purpose and the meaning of the language, did not tell us to favor the former.  It instead ruled on the question of liability under a separate statute not relevant here. Id. at 977.

Even if it seems strange that Minnesota precludes outside creditors from challenging the propriety of a corporate distribution, we can't and won't ignore the

---

[17] In Butler, which we decided before the Minnesota Supreme Court issued Finn, we avoided the issue.  See Butler, 2002 WL 31882859, at \*6.

[18] One commentator explains that the exception was originally a suggested variation of the Model Business Corporations Act (Model Act).  The variation was meant to alleviate any confusion between the Model Act's and the old Uniform Fraudulent Conveyance Act's insolvency tests for distributions.  The Uniform Fraudulent Conveyance Act was repealed and replaced with the Uniform Fraudulent Transfer Act in 1987, and this new act had an insolvency test less likely to be confused with the Model Act's test for corporate distributions. Minnesota nevertheless retained the optional provision even after adopting the Uniform Fraudulent Transfer Act in 1987.  John H. Matheson & Philip S. Garon, 18 Minn. Prac., Corporation Law & Practice sec. 6:11, n.1 (3d ed.).

**[\*33]** plain language of the statute.  We are not alone.  The U.S. Bankruptcy Court for the District of Minnesota granted partial summary judgment in a case because the party's claims were based on MUFTA but the transfers were distributions governed by MBCA.  See Metro. Steel Fabricators, Inc. v. Michalski (In re Metro. Steel Fabricators, Inc.), 191 B.R. 150, 152 (D. Minn. 1996).  Washington state has a similar provision in its corporation statutes, providing that "such provisions supersede the applicability of any other statutes of this state with respect to the legality of distributions."  Wash. Rev. Code Ann. sec. 23B.06.400(6) (West 2013).  The U.S. Bankruptcy Court for the Eastern District of Washington held that this provision deprives a plaintiff of a cause of action under Washington's fraudulent-transfer laws when the transfer is a corporate distribution governed by that state's corporation law.  See Metro. Mortg. & Sec. Co. v. Sandifur (In re Metro. Mortg. & Sec. Co.), 347 B.R. 406, 410 (E.D. Wash. 2006).  The court based its holding on the fact that "the statute is unambiguous and its meaning is clearly articulated in its express language."  Id.  This holding is particularly interesting because the Washington statute is less clear than the MBCA in displacing fraudulent-transfer law, which expressly cross-references MUFTA.[19]

---

[19] Minnesota and Washington aren't all by themselves.  See N.M. Stat. Ann. sec. 53-11-44(E) (2004) (similar to Washington); N.D. Cent. Code Ann. sec. 10-

(continued...)

[*34] The Commissioner does argue that the stock sale by itself, quite apart from the redemption, was a liquidation, but that still wouldn't free it from the MBCA's restrictions.[20] Following the plain language of the statute and the reasoning of these courts, we hold that neither the stock redemption nor the stock sale and redemption together is governed by MUFTA. We cannot read the MBCA to let a hypothetical unsecured creditor challenge the redemption under MUFTA at all. The Commissioner has no greater rights than such a creditor. Even if the redemption was illegal at the time it occurred, the MBCA doesn't give standing to challenge an illegal distribution to the Commissioner or any other unsecured general creditor. Minn. Stat. Ann. secs. 302A.557, 302A.559 (West 2011); see also McGraw, 384 F.3d at 976.

---

[19](...continued)
19.1-92(3)(c) (2012) (similar to Minnesota).

[20] This is another reason the Commissioner's substance-over-form argument fails. If we were to apply substance-over-form principles as the Commissioner suggests MUFTA would not apply to a transaction recast as a direct transfer from BNP to the shareholders: The plain language of MBCA supersedes MUFTA in Minnesota when the transfer is a corporate distribution, and a corporate "distribution" includes a "distribution in liquidation." Minn. Stat. Ann. sec. 302A.011 subdiv. 10 (West Supp. 2017). Due to this rather unusual statutory language, even recasting the redemption-plus-sale as a liquidation would not free it from MBCA's broad language.

**[\*35]** B.     Commingling as Transfer

The Commissioner next tries to set up several later arguments with a contention about the effect of the shareholders' escrow agreement with the other parties to the overall deal. He wants very much to show that the money left behind in BNP after the redemption somehow found its way to the shareholders. And a first step in his reasoning is to argue about the effects of the commingling of funds to the shareholders and from BNP in that account. He argues that once BNP and MidCoast both transferred their respective obligations to the escrow account, the fungibility of money amounted to a commingling of funds and the cash that flowed to the shareholders must have come from BNP. The shareholders disagree, and they cite the "earmarking" doctrine. This is a rule of bankruptcy law that states there is not a voidable preference when a debtor makes a transfer to an old creditor with money received from a new creditor. See Kaler v. Community First Nat'l Bank (In re Heitkamp), 137 F.3d 1087, 1088-89 (8th Cir. 1998). We don't think this doctrine applies here--one does not find it outside bankruptcy law, though it reflects a commonsense understanding that there are some circumstances where a debtor serves as a conduit between two creditors and isn't preferring one to another. That's not really the question before us, which is not whether the stock sale was a voidable preference but whether it was a fraudulent transfer.

[*36] The Commissioner himself also cites cases from outside the world of fraudulent transfers. His are cases about money laundering that discuss the fungibility of money, and courts have reasoned in such cases that it would be impossible for the government to have to prove which dollars in a commingled account were dirty and which were clean. That's not the situation here either. In these cases, the withdrawals matched exactly the deposits from the two parties, and the escrow agent was contractually obligated to ensure that certain sums of money that came from one party reached the other. In other words, when the escrow agent received money from BNP, "it held the [funds] only for the purpose of fulfilling an instruction to make the funds available to someone else." Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988). We agree with the shareholders that the escrow agreement unambiguously identified which money was coming from whom and where the escrow agent should send it. The agreement required the escrow agent to transfer the exact amount of money that it received from MidCoast to three different accounts and the exact amount of money received from BNP to MidCoast's operating account. The escrow agent's contractual duties trump the fact that the funds were very briefly placed in the same account.

**[*37]** The shareholders specifically cite <u>Starnes</u> as direct support. At one point during the Midco transaction at issue in <u>Starnes</u>, the corporation's and MidCoast's money both ended up in the same escrow account. 680 F.3d at 424. We don't deny this similarity between these cases and <u>Starnes</u>, but <u>Starnes</u> turned not on commingling but on whether the corporation was rendered insolvent because of the transaction. <u>Id.</u> at 432-33. Without insolvency, the transaction was not fraudulent regardless of any commingling. We therefore hold that this theory of liability also fails.

C.     <u>Transferee of a Transferee Liability</u>

The Commissioner next argues that even if the shareholders never received a direct transfer from BNP, there were two fraudulent transfers here. BNP's transfer to MidCoast, and then MidCoast's transfer to the shareholders. He argues that--even if we have to look at all these transactions transfer by transfer--both of these transfers were fraudulent and thus keep unbroken a chain of recovery at least for the amount of the stock sale. The First Circuit examined this theory at length in <u>Frank Sawyer Trust of May 1992</u>. In <u>Frank Sawyer Trust</u>, the petitioner trust owned four corporations that sold all their assets. After these sales, the trust sold the companies (which held only cash and unmatured tax liabilities) to Fortrend, an entity similar to MidCoast. Fortrend created an LLC and two corporations to buy

**[*38]** them.  The transaction started with the trust's execution of a sale agreement which it then placed in escrow.  Fortrend then transferred the purchase price to the trust, and the trust released the documents from escrow.  A short time later, Fortrend's LLC and new corporations, which now owned the trust's old corporations, caused them to transfer substantially all their cash up to the LLC and new corporations, which in turn transferred this cash up to Fortrend.  The IRS sought to impose transferee liability on the trust, and we held for the trust because it never received a transfer directly from the old corporations and the Commissioner failed to prove we should collapse the transactions.  The First Circuit remanded the case because we didn't consider a transferee-of-a-transferee theory.  Sawyer Tr., 712 F.3d at 606.

To hold the trust liable, that court said, one first has to determine if the IRS was a creditor of the LLCs.  Id. at 607.  It said the IRS could be a creditor of the LLC and new corporations if they received a fraudulent transfer from the taxpayers (i.e., the old corporations).  Id.  The taxpayers transferred nearly all their money to the LLCs in return for nothing, which strongly suggested a fraudulent transfer.  Id.  According to the court, this fraudulent transfer would give the IRS a "claim" against the LLC and new corporations and therefore it would be a "creditor" of them because a creditor is someone who has a "claim".  Id.  This

[*39] "claim" would be based on the IRS's claim against the transferor, i.e., the unpaid taxes. Once the IRS is a creditor of the LLC and new corporations, it can go after transferees of fraudulent transfers from them, just as it could go after transferees of fraudulent transfers from the old corporations. Id. at 608. These fraudulent transfers might have occurred when the LLC and new corporations transferred the purchase prices to the trust in exchange for ownership of the old corporations. Id. The First Circuit left it to us on remand to determine if these transfers were fraudulent, and we ultimately found they were. See Sawyer Tr. of May 1992 v. Commissioner, T.C. Memo. 2014-59. One can see a possible problem in the First Circuit's analysis--it viewed the transfers in an order that didn't actually occur, because the transfer to the trust from the LLC and new corporations actually occurred first. This suggests that what was being transferred from the LLC and new corporations to the trust was not what was later transferred from the old corporations to the LLCs. But this didn't matter to the First Circuit's analysis because it reasoned that under UFTA, a creditor can recover from a transferee "whether the creditor's claim arose before or after the transfer was made." Sawyer Tr., 712 F.3d at 609.

To sum up, the IRS was a creditor of the LLC and new corporations because they received fraudulent transfers from the old corporations. The IRS's claim

**[\*40]** against the LLC and new corporations was based on its claim against these old corporations, i.e., their unpaid taxes. The IRS could then recover against a transferee of the LLC and new corporations for its claim against them if those later transfers were also fraudulent. It didn't matter that the "initial" transfer actually occurred later in time because UFTA allows recovery for future creditors.[21]

Of particular note to us is that in Frank Sawyer Trust and Cullifer v. Commissioner, T.C. Memo. 2014-208, aff'd, 651 F. App'x 847 (11th Cir. 2016), we didn't focus on the *source* of the money the taxpayers received. In both cases, the taxpayers received money from the Midcos *before* the Midcos made the taxpayers transfer their money to the Midco. This means that the taxpayers unquestionably received money that cannot be traced to their own corporations.[22] Transferee-of-a-transferee might imply that we look for the same property as it moves from one entity to another, but that wasn't how we reasoned in these cases.

---

[21] We later applied a similar analysis in Cullifer v. Commissioner, T.C. Memo. 2014-208. We found transferee-of-a-transferee liability in Cullifer for the same reasons as we did in Frank Sawyer Trust. The transfers occurred in reverse order, just as they did in Frank Sawyer Trust.

[22] We even noted in Cullifer that one of the purposes of the escrow arrangement was "to ensure that [the taxpayer] was being purchased using outside funds." Cullifer, at \*27. Nonetheless, we held that the taxpayers were liable as transferees of a transferee.

**[\*41]** This might mean that it doesn't matter whether Midco used its own money to pay the shareholders for their BNP stock.

But it also means that we are left here with questions that can't be answered on summary judgment. This series of transfers differs from the ones in <u>Frank Sawyer Trust</u> and <u>Cullifer</u> in that BNP transferred all of its cash to MidCoast at the same time that MidCoast transferred money to the shareholders. BNP's money went directly into a MidCoast operating account, not an account owned by BNP, LLC.

The first transfer we analyze is the transfer from BNP to MidCoast. Despite the transfer of cash directly to MidCoast, the proper party to consider the transferee is BNP, LLC. The share purchase agreement states that BNP will transfer all of its cash to BNP, LLC, or as BNP, LLC, directs. The closing agreement and the escrow agreements instruct the escrow agent to release the funds to MidCoast's counsel or as she directs. MidCoast's counsel, Ann L. Smith, directed the escrow agent to wire the funds to MidCoast, not BNP, LLC. This arrangement raises interesting questions of which party is the initial transferee.

Even though the funds never went to a BNP, LLC, account, it had the right to receive those funds under the agreement. When bankruptcy courts analyze the Bankruptcy Code's fraudulent-transfer provisions, they apply a "dominion and

**[*42]** control" test. See Luker v. Reeves (In re Reeves), 65 F.3d 670, 676 (8th Cir. 1995). This test focuses on which party had dominion and control, not mere possession, over the transferred property. Id. It's often applied to find an intermediary, such as a bank or the escrow agent here, isn't a transferee, but we believe its application also sheds light on this situation. Under the terms of the agreement, it was BNP, LLC, and not MidCoast, that had dominion and control over the funds at first. BNP, LLC, chose to have them transferred elsewhere, but that actually shows that it had dominion and control over them. We held the same thing in Cullifer. The purchaser in Cullifer had the taxpayer transfer substantially all its cash directly to MidCoast, but we held that the reality of the transfer was best "viewed as transfers of cash from [the taxpayer] to [the LLC], followed by subsequent transfers from [the LLC] to MidCoast." Cullifer, at *68.[23]

Once we've determined that BNP, LLC, is the transferee, we need to determine if the transfer was fraudulent. The answer is yes. BNP received nothing in return for the transfer of all its cash and it was rendered insolvent by the transfer. Just as in Frank Sawyer Trust, this gives the IRS a "claim" against BNP,

---

[23] We note that the shareholders here even seem to admit that BNP, LLC, was the real transferee. They said that after the transfers through the escrow accounts, "BNP, LLC, as the purchaser of [the shareholders'] stock and sole member of the company, obtained control over [BNP's] cash."

[*43] LLC, under MUFTA and makes the IRS its "creditor". See Minn. Stat. Ann. sec. 513.41(4) (West 1987).

The second transfer--from MidCoast to the shareholders--gives some trouble. It was MidCoast, not BNP, LLC, that paid the purchase price to the shareholders. This might suggest there was no transfer from a debtor of the IRS (here, BNP or BNP, LLC) to the shareholders. But we addressed this same issue in Cullifer. The money for the purchase price came from MidCoast in Cullifer, but we found that the LLC actually paid for the stock. A significant fact in Cullifer, however, was that the LLC borrowed from MidCoast an amount approximately equal to the purchase price on the same day as the purchase which enabled us to find that the money sent from the MidCoast account was really the LLC's money. In Cullifer, MidCoast simply skipped the step of transferring the loan proceeds to the LLC's bank account before sending the money over to the shareholders.

We don't know at this stage what happened in these cases. There are some indications that the same arrangement was used here as in Cullifer. The purchase agreement says that BNP, LLC, *not* MidCoast, would wire the purchase price to the shareholders. The escrow agreement calls MidCoast the "Lender" and specifically says that MidCoast "anticipates entering into Demand Credit Agreements * * * with BNP, LLC, * * * and lending [BNP, LLC] those funds

**[\*44]** required to complete the purchase." But the record before us doesn't show whether these credit agreements ever existed, so we can't say who really paid for the shares. If there really never was a loan from MidCoast to BNP, LLC (or at least a contribution of cash), that raises other questions of how BNP, LLC, can be held to have acquired the stock without paying anything for it. That is, however, beside the point for our purposes today. Without these facts, we can't say which party paid for the shares. And, because we can't, we don't need to analyze whether the second transfer was fraudulent.[24]

On this argument, then, there can be no decision on summary judgment.

D.     Transfer for the Benefit of the Shareholders

Next up is the Commissioner's fallback position that at least a portion of the deal's proceeds--namely, the amount of cash the shareholders received that was greater than they would have received as net proceeds of a fully taxed liquidation-- is a fraudulent transfer. See Sawyer Tr. of May 1992, T.C. Memo. 2014-59.

---

[24] Determining which party is the transferor of the second transfer is important for another reason. For the Commissioner to prove this second transfer was also fraudulent, he must prove that the transferor was "engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small * * * or intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Minn. Stat. Ann. sec. 513.44(a)(2)(i)-(ii) (West 1987). These answers may very well differ depending on whether MidCoast or BNP, LLC, was the record transferor.

**[*45]** MUFTA does allow recovery against a third party to a fraudulent transfer, even if he was not a transferee, if the transaction occurred for his benefit. Minn. Stat. Ann. sec. 513.48(b)(1) (West 1987). The Commissioner's argument is straightforward. BNP's transfer of cash to the escrow account was done for the benefit of the shareholders because without it MidCoast would not have sent the purchase price to the escrow account and that money would not then have gone to the shareholders. The Commissioner points to Stuart as support. We held in Stuart v. Commissioner, 144 T.C. 235, 265-67 (2015), that the transfer from the corporation to MidCoast was fraudulent and that the IRS could collect some of the corporation's tax liability from its shareholders. We found that Nebraska (whose law governed) allowed for recovery against those for whose benefit the fraudulent transfer occurred and that the shareholders fit this description. Id. at 268. We said that "the shareholders undoubtedly benefited from [the corporation's] transfer of the money to MidCoast because without it * * * [MidCoast] would not have released [its cash] * * * for disbursement to the shareholders. That amount was substantially in excess of the amount that the shareholders would have received had they * * * liquidated the company." Id. at 268-69.[25]

_____

[25] The Eighth Circuit reversed and remanded Stuart to consider whether the stock sale in that case should have been recharacterized as a liquidating

(continued...)

**[\*46]** The shareholders counter with two arguments. They claim <u>Stuart</u> is distinguishable because the shareholders in that case first had to transfer the company's money to an account and only then did MidCoast transfer its money, whereas here the agreements required simultaneity. They point to no authority that says this distinction matters, and we can't see any: Simultaneity is not inconsistent with conditionality, and we see no genuine dispute here about the fact that MidCoast would not have transferred its money to escrow without BNP's binding obligation to do the same. In this sense, MidCoast wouldn't have transferred the purchase price but for BNP's transfer of its cash to the escrow account.

The shareholders also argue that <u>Stuart</u> interpreted Nebraska law and Nebraska law is different than Minnesota's. It's true that <u>Stuart</u> doesn't bind us

---

[25](...continued)

distribution to the shareholders under Nebraska law. <u>See</u> <u>Stuart v. Commissioner</u>, 841 F.3d 777 (8th Cir. 2016), <u>vacating and remanding</u> 144 T.C. 235 (2015). That opinion is not a problem here because we apply Minnesota law here. We also do not need to address yet the argument that "transfer for the benefit of" means that the alleged fraudulent transfer must itself benefit the alleged transferee directly instead of in a "but for" causation way. It is possible that this language in the MUFTA means to capture only the benefit someone like guarantor gets when a transfer is made to the obligee of the debt he's guaranteed, and not someone who benefits from a separate transaction that would not have occurred but for the challenged transaction like the sort we discussed in <u>Stuart</u>. <u>See</u> <u>Bonded Fin. Servs., Inc.</u>, 838 F.2d at 896.

**[\*47]** because here we face a different state's fraudulent-transfer law. As a federal court addressing a question of state law, our task is to apply the law as the state's highest court already has or, if it hasn't spoken on the issue, then to apply it as we believe that court would. See Tricarichi v. Commissioner, T.C. Memo. 2015-201. The shareholders point us to no Minnesota Supreme Court case interpreting this portion of Minn. Stat. section 513.48, and our independent research has found none either.

We may have some help from precedent. We think Judge Easterbrook's opinion in Bonded Financial is especially helpful. In that opinion, the Seventh Circuit held that someone can't be both a subsequent transferee and an entity for whose benefit the initial transfer was made, because "[t]he structure of the statute separates initial transferees and beneficiaries, on the one hand, from 'immediate or mediate transferee[s]', on the other." 838 F.2d at 895.

Judge Easterbrook observed that "someone who receives *the* money later on is not an 'entity for benefit such transfer was made.' * * *." Id. at 896 (emphasis added). The key word being "the". We have funds from MidCoast *and* from BNP here, and while the petitioners certainly got something, was it *the* money BNP first transferred to MidCoast? The answer might be no, but we can't hold here that

**[*48]** there is no genuine factual dispute. As we concluded in the last section, we don't know who paid for the BNP shares.

We must deny summary judgment on this theory.

E.    Actual Fraud

The Commissioner also argues, in addition to his constructive-fraud claims, that the shareholders entered this transaction with actual fraudulent intent. MUFTA provides a nonexhaustive list of eleven factors (also known as "badges") that can help support an inference of actual fraud, given that direct evidence is very hard to come by. These eleven factors are

- the transfer or obligation was to an insider;

- the debtor retained possession or control of the property transferred after the transfer;

- the transfer or obligation was disclosed or concealed;

- before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

- the transfer was of substantially all the debtor's assets;

- the debtor absconded;

- the debtor removed or concealed assets;

- the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

[*49]  •  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

•  the transfer occurred shortly before or shortly after a substantial debt was incurred; and

•  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn. Stat. Ann. sec. 513.44(b) (West 1987).

The shareholders claim that the record is completely without any evidence to prove they acted with actual fraudulent intent.  The Commissioner asserts that a number of the badges are present.  These include:

•  BNP didn't receive reasonably equivalent value for its transfer;

•  the series of transactions rendered BNP insolvent;

•  the series of distributions were to insiders;[26]

•  the series of transactions were of substantially all of BNP's assets; and

•  the series of transactions occurred shortly after BNP had incurred a substantial liability.

The Commissioner also asserts other arguments as representing "badges," although they aren't specifically enumerated in the statute.  These include BNP's

---

[26] "Insider" under MUFTA includes directors of a debtor corporation, officers of a debtor corporation, and people in control of a debtor corporation. Minn. Stat. Ann. sec. 513.41(7)(ii)(A)-(C) (West 1987).

[*50] attempt to conceal the fraud by including protective clauses in the agreement, BNP's needless transfer of its cash to MidCoast as part of the transaction (as opposed to simply doing it after BNP, LLC, acquired ownership of BNP), BNP's knowledge of the fraudulent transactions to come, and BNP's attempt to disguise the transfers as legitimate when in reality they were simply a liquidation.

We agree with the Commissioner that there is no genuine dispute that some of the factors are present here. These include BNP's being rendered insolvent and BNP's not receiving reasonably equivalent value in exchange for its cash. And the presence of many factors can create a presumption of actual fraud. See, e.g., Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 866 (8th Cir. 2015). Courts may thus find actual fraudulent intent as a matter of law at the summary-judgment stage. See, e.g., United States v. Johnson, 99 A.F.T.R.2d (RIA) 2007-2573 (D. Minn. 2007). But here, despite the presence of some of the badges of fraud, the circumstantial evidence simply doesn't prove there's not a genuine dispute about the shareholders' actual intent. Their intent is a material fact here, and when a dispute about intent is the focal point, we won't rule on it as a matter of law because "questions of intent prevent summary judgment." Bonded Fin. Servs., Inc., 838 F.2d at 895.

[*51] F.     <u>MBCA Liability</u>

Switching gears, the Commissioner also asserts liability under MBCA.  His first problem is that, as the shareholders observe, any liability under Minn. Stat. Ann. section 302A.557 subdiv. (West 2011) is limited to "the corporation, its receiver * * * or a director."  The Commissioner is none of these.

The MBCA might also make the shareholders liable as receiving undue distributions from a dissolution.  This requires a little more discussion.  The Commissioner correctly states that Minn. Stat. Ann. section 302A.781 (West 2011) gives creditors a right to go after shareholders in conjunction with MUFTA.  See <u>McGraw</u>, 384 F.3d at 977.  But a creditor can use this statute only if there was actually a dissolution and the shareholders actually received distributions from the corporation.  We've already discussed <u>Finn</u>'s application and why we conclude the shareholders didn't receive anything from BNP as part of the stock sale.  Without a distribution, there isn't any liability under this section.

The Commissioner relies on <u>McGraw</u> because the court in <u>McGraw</u> used this section to find the transferees liable.  <u>Id.</u> at 978.  It was undisputed in <u>McGraw</u> however, that the transferees received a distribution from the corporation (they received a distribution of stock in another company).  The court said that "there is a proper basis under Minnesota law to hold McGraw, *as a transferee of [the*

**[\*52]** *corporation's] assets*, personally liable to the IRS for [the corporation's] outstanding tax deficiencies and penalties." Id. (emphasis added). Unlike the court in McGraw, we conclude that the stock sale did not make the shareholders direct transferees of BNP. Minn. Stat. Ann. section 302A.781 subdiv. 2(b) (West 2016) (emphasis added) limits a shareholder's liability "to the portion of the *distributions* to shareholders in liquidation or dissolution." Even if the shareholders may be liable under the transferee-of-a-transferee theory of MUFTA, this section of the MBCA requires them to receive distributions from BNP. Because they didn't, the Commissioner can't use it.[27]

VI.     The Shareholders' Status as Transferees Under Section 6901

The state-law transferee-liability question is only one of two questions that needs to be answered to find for the Commissioner. The shareholders argue in their motion that they win as a matter of law because there's no theory of recovery under Minnesota law. They do not challenge their status as transferees under section 6901, at least not in their motion. Therefore, even though a finding against the Commissioner in this analysis would result in a finding for the shareholders as a matter of law, we don't address this question because it's not in dispute. The

---

[27] The section also requires there to be a liquidation or dissolution. We concluded above that Finn precludes us from collapsing transactions to find a *de facto* liquidation occurred. This also makes the MBCA inapplicable.

**[*53]** Commissioner does assert that the shareholders are transferees under section 6901, but because we have determined that a material fact is in dispute concerning the question of state-law liability, we likewise don't need to address this second question now.

Conclusion

There are material facts in dispute that prevent us from ruling on whether the shareholders are liable under the transferee-of-a-transferee or for-the-benefit of theories because it's unclear at the moment which entity actually paid for the stock and which entity actually received the stock. There are also material facts in dispute concerning the shareholders' actual intent to enter into fraudulent transfers. To the extent that we hold that Minnesota law prevents us from collapsing the transfers and finding that the shareholders received a transfer directly from BNP, we will grant the shareholders' motion. We also will grant the shareholders' motion to the extent we find that the partial stock redemption wasn't a fraudulent transfer. The rest of the shareholders' motion will be denied, and the Commissioner's motion will be denied.

Appropriate orders will be issued.