T.C. Memo. 2020-8

UNITED STATES TAX COURT

ALTA V LIMITED PARTNERSHIP, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 26828-08, 26829-08,       Filed January 13, 2020.
26865-08, 26867-08.

Vincent J. Beres, Amy L. Barnes, Michael G. Goller, and Sara Stellpflug

Rapkin, for petitioners.

Steven N. Balahtsis, Gail Campbell, Lyle B. Press, and Robert E. Dallman,

for respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Allsop Venture Partners III, Limited Partnership, docket No. 26829-08; Alta Subordinated Debt Partners III, L.P., docket No. 26865-08, and State of Wisconsin Investment Board, docket No. 26867-08.

**[*2]**          MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Pursuant to three separate notices dated August 21, 2008, sent to Alta V, LP (Alta V), Allsop Venture Partners III, LP (Allsop), and Alta Subordinated Debt Partners III, LP (Alta Sub), and one notice dated September 5, 2008, sent to the State of Wisconsin Investment Board (SWIB, and collectively with Alta V, Allsop, and Alta Sub, petitioners), respondent determined that petitioners are liable as transferees for the Federal income tax liability, additions to tax, penalty, and interest of Shockley Communications Corp. (SCC) for its short tax year ending May 31, 2001.  On the basis of respondent's determination as to the value of the assets transferred to petitioners, respondent determined that the amount of transferee liability of each petitioner relating to SCC's outstanding liability plus a penalty, additions to tax, and interest as provided by law are as follows:  (1) $7,165,820.78 for Alta V; (2) $25,160,577.15 for Allsop; (3) $4,261,532.97 for Alta Sub; and (4) $28,267,882.78 for SWIB.  These cases were consolidated for briefing and opinion.

These cases relate to three separate notices of deficiency concerning SCC's short tax year which ended on May 31, 2001.  One notice was sent to the corporation's last known address in Washington, D.C. (Washington notice), and a

**[\*3]** second joint notice was sent to Terry K. Shockley (T. Shockley) and Sandra K. Shockley (S. Shockley), the former corporate executives, at their home address in Madison, Wisconsin (Madison notice). The third notice was sent to Northern Communications Acquisition Corp. (NCAC), which had purchased SCC, at the NCAC's last know address in Arlington, Virginia (NCAC notice). A petition was filed in this Court only in response to the Madison notice, which was ultimately dismissed for lack of jurisdiction on April 26, 2007. SCC took no action in response to the Washington notice, and NCAC also took no action in response to the NCAC notice. The Internal Revenue Service (IRS) assessed against SCC its unpaid Federal income tax, penalty, and additions to tax. After the IRS made its assessment against SCC, it sent Transferee Notice of Liability Statements (notices of transferee liability) to the Shockleys on August 21, 2008, prompting them to file a second petition with this Court.

We found in Shockley v. Commissioner (Shockley I), T.C. Memo. 2011-96, that the Madison notice was invalid. We decided that the petition filed in response to the Madison notice neither prohibited assessment for the purposes of section 6503(a)(1) nor extended the period of limitations under section 6501(a) and (c), rendering the notices of transferee liability untimely. Respondent appealed and the Court of Appeals for the Eleventh Circuit reversed, holding that the Madison

[*4] notice was valid and that the petition filed in response to that notice suspended the period of limitations under 6501(a).  Shockley v. Commissioner (Shockley II), 686 F.3d 1228 (11th Cir. 2012).

On remand we found that if the Madison notice was valid, the notices of transferee liability were timely and the Shockleys were liable as transferees for SCC's unpaid Federal tax.  Shockley v. Commissioner (Shockley III), T.C. Memo. 2015-113.  On motion for reconsideration we supplemented our opinion in Shockley III and found that the Shockleys were liable for prenotice interest as well as postnotice interest calculated from the notice date and the dates they actually received distributions from SCC.  Shockley v. Commissioner (Shockley IV), T.C. Memo. 2016-8.  The Shockleys appealed, and the Court of Appeals for the Eleventh Circuit affirmed our decision in Shockley III as supplemented by Shockley IV.  Shockley v. Commissioner (Shockley V), 872 F.3d 1235 (11th Cir. 2017).

The issues for decision are:  (1) whether expiration of the period of limitations under section 6901(c) precludes respondent from assessing transferee liability against petitioners for SCC's tax year ending May 31, 2001; (2) if it is determined that the notices were timely, whether petitioners are liable as transferees for their respective portions of the unpaid determined and assessed

[*5] deficiency, additions to tax, penalty, and interest with respect to SCC's corporate income tax for 2001; (3) whether petitioners' liabilities are limited to the extent petitioners are good faith transferees who provided value to SCC; and (4) whether respondent met the burden of proving that petitioners are liable as transferees for the penalty assessed against SCC. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties have agreed that these cases may be decided on the stipulations and evidentiary record submitted in Sandra K. Shockley, Transferee, et al. v. Commissioner, docket Nos. 28207-08, 28208-08, and 28210-08, and their joint stipulation of facts. The facts with respect to these cases that were found in Shockley I, Shockley III, and Shockley IV, together with the stipulated facts, are incorporated in our findings by this reference. We summarize for convenience relevant facts from Shockley I, Shockley III, and Shockley IV and set forth additional findings for purposes of deciding the issues raised in these cases. When the petitions were filed, Alta V and Alta Sub had principal places of business in Boston, Massachusetts; Allsop had its principal place of business in Cedar Rapids, Iowa; and SWIB had its principal place of business in Madison.

**[*6]** <u>SCC</u>

After purchasing a radio station in Madison in early 1985, the Shockleys incorporated SCC, a closely held corporation, under the laws of Wisconsin. Between 1985 and 2000 SCC grew to own five television stations, a radio station, and a video production company in Wisconsin, as well as a television station and several radio stations in Minnesota. In 1995 SCC brought in additional investors to fund its significant business expansion. SCC ownership grew to include 29 separate shareholders, including: the Shockleys, Shockley Holdings, L.P. (Shockley Holdings), which was an entity owned by the Shockleys and their adult children, several other individuals, and a number of investment funds including petitioners (collectively, SCC shareholders). As of May 31, 2001, petitioners and the Shockleys owned the following percentages of outstanding SCC common stock:

| | |
|---|---|
| SWIB | 24.57% |
| Allsop | 21.87 |
| T. Shockley | 10.18879 |
| S. Shockley | 10.18879 |
| Alta V | 6.23 |
| Alta Sub | 3.7 |
| Shockley Holdings | 3.52508 |

**[*7]**  At all material times petitioners were represented on the SCC board of directors (SCC board).  An SWIB employee, Jonathan Vanderploeg, served as an adviser on the SCC board.  (Because SWIB was an agency of the State of Wisconsin, its employees could not serve as board members.)  Brian McNeill represented both Alta V and Alta Sub and Paul Rhines represented Allsop as members of the SCC board.  The Shockleys served both as SCC board members and as SCC executive officers.  In their roles as SCC executive officers T. Shockley served as president and treasurer, and S. Shockley served as vice president and secretary.

SCC Shareholder Agreement of November 1995

On November 1, 1995, SCC shareholders entered into a shareholders' agreement (SCC shareholders' agreement).  This agreement closed on the same date.  The agreement defined SCC shareholders as follows:  (1) management investors, which included the Shockleys; (2) nonmanagement investors, which included Allsop; (3) new investors, which included SWIB, Alta V, and Alta Sub; and (4) Burr Egan investors, which comprised Alta V, Alta Sub, and Customs House Partners (an entity not a party to these cases).  The SCC shareholders' agreement granted petitioners a right of redemption, or "put option", that upon exercise required SCC to repurchase their shares as follows:

**[*8]**  ARTICLE VIII     PUT RIGHTS.

Section 8.1.    New Investor's Right to Put New Investor Shares to the Company.  The Company hereby irrevocably grants to the New Investors the right (the "Put Option") to require the Company to purchase all but not less than all (except as provided herein) of the Shares then held by any New Investor exercising its rights, or participating in such exercise, pursuant to this Article VIII (with respect to such exercise, the "New Investor Shares") and, to the extent provided below, to purchase all but not less than all (except as provided herein) of the shares of Common Stock held by any Non-Management Investor (with respect to such exercise, the "Non-Management Investor Shares") as set forth below and, if required, with the prior consent of the FCC:

(a)     At any time after the date which is six and one-half years after the Closing Date, SWIB and/or a Burr Egan Investor may exercise the Put Option by delivering a written notice to the Company (with a copy to the other New Investors and the Non-Management Investors) and the Company (i) shall use its best efforts to incur additional debt, to the extent necessary, to a maximum principal amount for all existing debt plus such additional debt of up to 4.0 times operating cash flow for the immediately preceding twelve calendar month period then ended and to utilize available cash to purchase the Shares held by such exercising New Investor and any other New Investor or Non-Management Investor who elects to participate pursuant to the provisions of the next sentence, and (ii) shall use commercially reasonable efforts to close such purchase on or prior to the seventh anniversary of the Closing Date.  In the event SWIB or a Burr Egan Investor exercises the Put Option pursuant to the terms of this subsection (a), each other New Investor and each Non-Management Investor shall have the right to participate by providing written notice to the exercising New Investor and the Company within ten (10) business days of the delivery of the notice provided for in the preceding sentence.  The consideration to be paid to such New Investors and Non-Management Investors upon exercise of the Put Option shall be cash in an amount equal to the sum of

[*9] (i) the New Investor Portion or the Non-Management Investor Portion (as the case may be) of the Fair Market Value, calculated in accordance with Section 8.2 hereof, as of a date which is as close to the closing of the exercise of the Put Option as is reasonably practicable, which date shall in no event be earlier than the date on which notice of the exercise of the Put Option is delivered to the Company, plus (ii) interest on such amount from the date of calculation of the Fair Market Value to and including the date of payment at a rate equal to 15% per annum. In the event that the Company has the ability to purchase some but not all of the Shares held by such New Investors and Non-Management Investors, the participation by each such New Investor and Non-Management Investor shall be on a pro-rata basis in accordance with the number of Shares which such New Investor or Non-Management Investor then holds; provided, however, that in the event any such New Investor or Non-Management Investor is not able to sell all of his, her or its Shares then held as result of this sentence, such New Investor or Non-Management Investor may withdraw from participating in such put exercise and the participation by the remaining New Investors and Non-Management Investors shall be adjusted accordingly. [Emphasis added.]

(b) At any time after the date which is seven years after the Closing Date (whether or not any action has been taken or is currently being taken under Section 8.1(a) hereof), SWIB and/or a Burr Egan Investor may exercise the Put Option under this Section 8.1(b) by delivering a written notice to the Company (with a copy to the other New Investors and the Non-Management Investors) and the Company shall use its best efforts to take any and all actions necessary or appropriate to purchase the Shares held by such exercising New Investor and any other New Investor or Non-Management Investor who elects to participate pursuant to the provisions of the next sentence, including without limitation incurring additional debt and utilizing available cash as set forth in Section 8.1(a), and to close such purchase on or prior to the date which is seven and one-half years after the Closing Date. In the event SWIB or a Burr Egan Investor exercises the Put Option pursuant to the terms of this

**[*10]** subsection (b), each other New Investor and each Non-Management Investor shall have the right to participate by providing written notice to the exercising New Investor and the Company within ten (10) business days of the delivery of the notice provided for in the preceding sentence.  The consideration to be paid to such New Investors and Non-Management Investors upon exercise of the Put Option shall be cash in an amount equal to the sum of (i) the New Investor Portion or the Non-Management Investor Portion (as the case may be) of the Fair Market Value, calculated in accordance with Section 8.2 hereof, as of a date which is as close to the closing of the exercise of the Put Option as is reasonably practicable, which date shall in no event be earlier than the date on which notice of the exercise of the Put Option is delivered to the Company, plus (ii) interest on such amount from the date of calculation of the Fair Market Value to and including the date of payment at a rate equal to 15% per annum. * * * [Emphasis added.]

Section 8.2.    Determination of Fair Market Value of New Investor Shares.  The New Investor Portion or the Non-Management Investor Portion (as the case be) of the Fair Market Value for any New Investor exercising the Put Option, or any New Investor or Non-Management Investor electing to participate as provided in Section 8.1 above, shall equal (i) the fair market value (as defined below) of the Company, multiplied by (ii) a fraction, the numerator of which is the number of Shares held by the New Investor so exercising or the New Investor or Non-Management Investor (as the case may be) participating and the denominator of which is the number of shares of Common Stock of the Company then outstanding, on a fully diluted basis.  The fair market value (the "Fair Market Value") of the Company shall be determined following the exercise of the Put Option as of the valuation dates specified in Section 8.1 in accordance with the following provisions:

(a)    The Company and the New Investors so exercising or participating agree to negotiate in good faith in an effort to reach agreement upon such Fair Market Value for a period of thirty (30) days following exercise of the Put Option.  If within such thirty (30)

**[*11]** day period, the Company and such New Investors agree upon such Fair Market Value, the Fair Market Value shall be as so agreed;

(b)    If the Company and the New Investors holding a majority of the outstanding shares of Common Stock held by the New Investors so exercising or participating are unable to reach agreement on the Fair Market Value, the Fair Market Value shall be determined at the Company's expense by one or more independent investment banking firms of national standing acceptable to the Company and such majority in interest of such New Investors and selected as hereinafter provided.  One investment banking firm mutually acceptable to such majority in interest of such New Investors and the Company shall be selected.  If the Company and such majority in interest of such New Investors are able to agree on a mutually acceptable investment banking firm, such firm shall determine the Fair Market Value as provided in clause (c) below.  In the event such majority in interest of such New Investors and the Company fail to select a mutually acceptable investment banking firm, such majority in interest of such New Investors and the Company shall each select an investment banking firm.  Each of the two appointed firms shall be instructed to determine, within no more than ten (10) days, the Fair Market Value as provided in clause (c) below.  If the determinations of the two investment banking firms do not differ by more than 10% of the lower thereof, then the average of the two determinations shall be conclusively deemed to be the Fair Market Value.  If the determinations of the two investment banking firms differ by more than 10% of the lower thereof, then the two investment banking firms shall, on the earliest practicable date, appoint a third investment banking firm, or if they cannot agree, such third investment banking firm shall be appointed in accordance with the rules of the American Arbitration Association * * * and such investment banking firm shall make its determination of the Fair Market Value as provided in clause (c) below.  In which case, the final and conclusive Fair Market Value shall then be the average of the two closest valuations among the determinations thereof of the three investment banking firms.  All decisions of the investment banker(s) shall be rendered in writing and shall be signed by the investment banker(s).  The Fair Market Value

[*12] determined as provided in this Section 8.2, shall be conclusive, final and binding * * *

(c)    In determining Fair Market Value of the Company, the Company and the New Investors so exercising and the New Investors and Non-Management Investors so participating agree that each investment banker shall be instructed, among other things:  (i) to consider recent relevant transactions involving similar companies, owning and operating radio and/or television stations in similar markets, (ii) to consider the current market for publicly traded companies owning similar radio and/or television stations in similar market, (iii) to utilize all appropriate valuation models and techniques employing a wide range of assumptions, (iv) to consider the value of any options to acquire any interest in any company, business or asset (whether by acquisition of stock, assets or otherwise) to the extent the value of such interest exceeds the exercise price (in cash, securities, other assets, assumption of liabilities or otherwise) of such option, and further (v) that the Fair Market Value of the New Investor Shares and the Non-Management Investor Shares (as the case may be) held by the New Investors so exercising or the New Investors or Non-Management Investors so participating (as the case may be) shall be determined on the basis of the following assumptions:  (A) without any reduction in value for lack of control or the inherent lack of liquidity of non-public minority shares, (B) giving full effect to the earnings history and prospects of the Company, (C) that there were liquid public markets for the Common Stock capable of absorbing a sale of all such New Investor Shares and Non-Management Investor Shares with no discount from otherwise prevailing market prices or for illiquidity, (D) the proceeds that would be realized would be those realized upon the sale of all of the Company's assets, without reduction for any taxes or transaction expenses that might occur as a result of the sale or any refinancing, (E) that there is a willing buyer with adequate recourse debt financing and a seller with no compulsion to sell, and (F) otherwise on a basis which values all shares of Common Stock at the same per share price.  Each investment banker shall be required to render an opinion that the Fair

**[\*13]** Market Value is a price which is reasonably likely to be obtained in a current sale of the Company.  \* \* \*

The SCC shareholders' agreement further provided a "drag-along" provision that permitted a supermajority of SCC shareholders to compel the remaining SCC shareholders to sell their shares in the company as follows:

Section 3.4.    Drag-Along Obligations.

(a)    In the event that <u>65% of the outstanding shares of Common Stock held by the Investors</u> (without regard to any dilution as a result of the equity earn back set forth in Section 6 of the Stock Purchase Agreement or as a result of the grant or exercise of options and awards under the Senior Management Incentive Plan) determine to sell or otherwise dispose of all or substantially all of the assets of the Company or all of the capital stock of the Company, in the same negotiated transaction, to any other unaffiliated party or parties, or to cause the Company, in the same negotiated transaction, to merge with or into or consolidate with any other unaffiliated party or parties (in each case, the "Buyer") in a bona fide negotiated transaction (a "Sale"), each Investor (including any Permitted Transferees) shall be obligated to and shall, upon request of such other Investors:  (i) sell, transfer and deliver, or cause to be sold, transferred and delivered, to the Buyer, his, her or its Shares on the same terms (including, without limitation, for the same consideration per Share as will be received by such other Investors) applicable to such other Investors; and (ii) execute and deliver such instruments of conveyance and transfer and take such other action, including voting such Shares in favor of any Sale proposed by such other Investors and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as such other Investors or the Buyer may reasonably require in order to carry out the terms and provisions of this Section 3.4, subject to the execution of such agreements and documents by such other Investors and, if required, the prior consent of the FCC; provided, however, that the provisions

[*14] of this Section 3.4 shall be inoperative and of no further force and effect with regard to any Sale <u>unless</u> (i) the New Investors consent to such Sale or other transaction, which consent shall be given or withheld in their sole and absolute discretion, <u>or</u> (ii) the resulting Sale provides any non-consenting New Investor with total consideration equal to its pro rata share of the aggregate consideration (including any payments in connection with noncompetition, consulting or similar agreements) to be received by all Investors and any other holder of equity interests in the Company, which consideration (<u>assuming such sale occurs within 6½ years of the Closing Date</u>) shall provide such New Investor with a compounded annual IRR from the Closing Date through and including the date of the consummation of such Sale equal to or in excess of 25% on such non-consenting New Investor's [sic] initial investment in the Company (as set forth on Schedule A to the Stock Purchase Agreement). [Emphasis added.]

<u>Decision To Sell SCC</u>

In 1999 the Shockleys, approaching retirement age, started to consider their future as owners of SCC. Around early 2000 they began exploring several strategic alternatives for SCC, including a stock sale and selling SCC's assets. On January 21, 2000, the Shockleys met with Stephen A. Schmidt, a managing director and tax partner of RSM McGladrey, Inc. (RSM). RSM, an affiliate of SCC's accounting firm McGladrey & Pullen, is a professional services firm that provided SCC and its shareholders with tax and structuring advice. RSM provided the Shockleys and other SCC board members an analyses prepared by Schmidt comparing six potential alternative futures for SCC: (1) a sale of assets by SCC followed by its liquidation, (2) a sale of SCC stock, (3) tax-free

[*15] reorganizations under section 368, (4) a "spin-off" of SCC's radio station assets (radio assets) under section 355 followed by a sale of SCC stock, (5) redemption of SCC stock from the shareholders, and (6) a sale of SCC stock using an employee ownership plan. The SCC board reviewed the RSM analysis comparing a stock sale with an asset sale, which projected that a stock sale would produce a much greater return of net after-tax proceeds to shareholders. For that reason, the SCC board decided to pursue a stock sale.

On April 5, 2000, T. Shockley on behalf of SCC entered into an exclusive brokerage agreement with Kalil & Co., Inc. (Kalil), a media broker. After the brokerage agreement was in place, Kalil began seeking potential buyers for SCC. At some point it became apparent that the general preference of buyers in the broadcasting industry was an asset sale. While Kalil was able to find potential buyers interested in SCC's assets, the broker struggled to find a broadcasting business that would be interested in buying the stock of a company such as SCC that had both television stations and radio stations. Buyers showing interest in the small-market radio stations were not interested in the midsized-market television stations, and vice versa.

**[*16]** <u>Sale of SCC's Television Assets</u>

One potential buyer, Quincy Newspapers, Inc. (QNI), a media company in Quincy, Illinois, made an offer in May 2000. Structured as an asset sale, the offer tendered a purchase price of $160 million for SCC's television stations and production company (television assets), which made up approximately 95% of SCC's total radio and television assets. However, on May 17, 2000, QNI withdrew its offer citing: (1) disagreement with paying a premium price related to SCC's prior capital investments in digital television broadcasting readiness, (2) disagreement with SCC's projected revenue streams, and (3) concerns about securing favorable interest rates. Throughout the following summer QNI and Kalil continued to negotiate the sale of SCC's television assets.

On or about August 25, 2000, Schmidt introduced the Shockleys to Integrated Capital Associates (ICA), a firm that facilitated stock sales of companies. During this meeting ICA discussed the possibility of using an intermediary transaction (midco) strategy. In September 2000 the SCC board decided to sell the company's stock to an ICA affiliated entity. T. Shockley informed Kalil of the SCC board's decision, and he continued to negotiate with QNI on behalf of the ICA affiliate. Eventually, on October 6, 2000, QNI sent a nonbinding letter of intent to ICA in which QNI offered to purchase the SCC

[*17] television assets from an undisclosed seller for $167 million. After further negotiation QNI increased the purchase price to $171 million in a revised nonbinding letter of intent, which it faxed to ICA on October 27, 2000 (QNI revised offer). Kalil accepted the QNI revised offer on behalf of an undisclosed seller on October 31, 2000.

Following Kalil's acceptance of the QNI revised offer they continued to negotiate adjustments to the purchase price to account for various issues. These issues included, among other things: (1) an anticipated renegotiation of a network affiliation agreement with American Broadcasting Corp. that would decrease network compensation; (2) Federal Communications Commission (FCC) regulations that prohibited QNI's purchase of SCC's television station in Rochester, Minnesota (Rochester television station), because of a market conflict; (3) the transfer of the Rochester television station to TSTT, LLC (TSTT), a new Shockley-controlled entity formed for the purpose; (4) granting QNI an option to purchase the Rochester television station at a later date; and (5) costs payable to key SCC managers under SCC's phantom stock deferred compensation plan.

By the end of December 2000 an entity named NCAC, which ICA formed for the purpose, entered into three agreements: (1) a stock purchase agreement (SPA) with the SCC shareholders dated December 28, 2000; (2) an asset purchase

[*18] agreement with QNI (QNI APA) dated December 29, 2000; and (3) an asset purchase agreement with TSTT (TSTT APA) dated December 29, 2000. The SPA provided that the SCC shareholders would sell to NCAC 100% of the SCC stock for a purchase price of $117 million, subject to certain adjustments. The QNI APA involved the sale of the Wisconsin television stations and production company by NCAC to QNI for $168 million, subject to certain adjustments discussed above, and the TSTT APA involved the sale of the Rochester television station by NCAC to TSTT for $3 million. Each of these agreements specified that it was to be governed by the laws of the State of Wisconsin.

On May 31, 2001, the closings of the sale of SCC stock and the sale of SCC assets took place at one of the law firms representing ICA. Immediately before the sale of 100% of SCC stock to NCAC the directors representing petitioners resigned from their SCC board positions as of that date. Petitioners neither raised the possibility of exercising their right of redemption nor sought compensation for surrendering such right at any point before the SPA closing date. Over an approximately three-hour period on the closing date ICA transferred SCC's stock and assets to a series of entities that it had formed with regard to the SPA and QNI APA, which QNI merged, renamed, and recharacterized. (Further details of the

[*19] entities and actions involved are not material to our decision here but may be found in Shockley III, at *35-*40.)

Sale of SCC's Radio Assets

On March 29, 2001, Midwest Communications, Inc. (Midwest), a Wisconsin corporation, made an offer to purchase the SCC radio assets from NCAC for $7.5 million. NCAC, through an ICA executive, accepted the offer on March 31, 2001. Midwest and NCAC entered into an asset purchase agreement (Midwest APA) on May 25, 2001, with respect to the SCC radio assets. On September 21, 2001, NCAC's successor entity sold SCC's radio stations to Midwest pursuant to the Midwest APA.

Distributions

After May 31, 2001, petitioners received distributions with regard to the sale of their SCC stock as follows:

| Date of distribution | SWIB | Alta V | Alta Sub | Allsop |
|---|---|---|---|---|
| May 31, 2001 | $22,245,176.27 | $5,639,082.89 | $3,353,578.30 | $19,799,907.93 |
| July 24, 2001 | 717,779.00 | 181,955.00 | 108,209.00 | 638,878.00 |
| Sept. 10, 2001 | 511,814.25 | 129,743.32 | 77,158.71 | 455,553.82 |
| Sept. 25, 2001 | 1,636,582.39 | 414,868.54 | 246,723.48 | 1,456,683.47 |
| Oct. 30, 2001 | 29,139.48 | 7,386.77 | 4,392.93 | 25,936.37 |

[*20]

| | | | | |
|---|---|---|---|---|
| Dec. 21, 2001 | 98,298.49 | 24,918.36 | 14,819.02 | 87,493.18 |
| Jan. 25, 2002 | 24,540.70 | 6,220.99 | 3,699.64 | 21,843.10 |
| Dec. 20, 2002 | 35,633.20 | 9,032.91 | 5,371.89 | 31,716.28 |
| June 6, 2003 | 2,482,037.00 | 629,189.00 | 374,180.00 | 2,209,203.00 |
| Oct. 29, 2003 | 486,882.00 | 123,423.00 | 73,400.00 | 433,362.00 |
| Total | 28,267,882.78 | 7,165,820.78 | 4,261,532.97 | 25,160,577.15 |

## Reporting and Examination

On or about February 24, 2002, the IRS received SCC's professionally prepared Form 1120, U.S. Corporation Income Tax Return, for its short tax year of January 1 through May 31, 2001. The Form 1120 listed a Washington, D.C., mailing address for SCC and reported that SCC had zero assets by the end of its 2001 tax year and zero tax due. It also reported that on May 31, 2001, SCC had merged into an ICA affiliated entity named Shockley Delaware Corp. (SDC) and that immediately thereafter SDC converted into a Delaware limited liability company resulting in SCC's liquidation and tax-free distribution under section 332.

On February 18, 2005, the IRS issued multiple notices of deficiency relating to SCC's short tax year ended May 31, 2001. On May 25, 2005, the Shockleys filed a petition in response to the notice that was sent to them at their then home

[*21] address in Wisconsin.  On April 26, 2007, that case at docket No. 9699-05 was dismissed for lack of jurisdiction because SCC lacked legal capacity to proceed in the case through the Shockleys.  On September 6, 2007, the IRS assessed Federal income tax, an addition to tax, and a penalty against SCC for 2001 as follows:

| Tax year ending | Deficiency | Penalty sec. 6662 | Addition to tax sec. 6651(a)(1) |
| --- | --- | --- | --- |
| May 31, 2001 | $41,566,515 | $8,313,303 | $2,078,276 |

Thereafter, the IRS undertook transferee examinations of eight of the largest SCC shareholders who sold their SCC shares to NCAC on May 31, 2001, including petitioners.  The IRS sent to petitioners notices of transferee liability on August 21, 2008.  In these notices the IRS stated that petitioners were liable for SCC's unpaid deficiency for Federal income tax, additions to tax, and a penalty as follows:

| Tax year ending | Deficiency | Penalty sec. 6662 | Additions to tax | |
| --- | --- | --- | --- | --- |
| | | | Sec. 6651(a)(1) | Sec. 6651(a)(2) |
| May 31, 2001 | $41,566,515 | $8,313,303 | $2,078,276 | $10,183,796 |

The transferee notices also stated that petitioners were liable for interest.

[*22]                                 OPINION

Petitioners' contend that: (1) expiration of the period of limitations under section 6901(c) precludes respondent from assessing transferee liability against them for SCC's tax year ending May 31, 2001; (2) if it is determined that the notices were timely, they are not liable as transferees under Wisconsin State law for their respective portions of the unpaid determined and assessed deficiency, additions to tax, penalty, and interest with respect to SCC's Federal corporate income tax for 2001; (3) their liability is reduced to the extent they are good faith transferees by the amount of reasonably equivalent value they provided to SCC; and (4) respondent failed to meet his burden of proving that they are liable as transferees for the penalty assessed against SCC. Respondent disagrees and seeks to collect the tax from petitioners through the procedural provisions of section 6901.

Section 6901 addresses transferee liability and provides that the liability, at law or in equity, of a transferee of property of a taxpayer owing Federal income tax "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred". Sec. 6901(a). Transferee liability under section 6901 includes related additions to tax, penalties, and interest owed by the

**[\*23]** transferor.  <u>Kreps v. Commissioner</u>, 42 T.C. 660, 670 (1964), <u>aff'd</u>, 351 F.2d 1 (2d Cir. 1965).  This Court has jurisdiction over transferee liability.  <u>See</u> secs. 6901(f), 6902; Rule 13(a).

I.  <u>Limitation on Assessment</u>

As a threshold matter we address petitioners' argument that the period of limitations under section 6901(c) precludes respondent from assessing transferee liability against them for SCC's tax year ending May 31, 2001.  Respondent disagrees and urges us to follow the decision of the Court of Appeals for the Eleventh Circuit in <u>Shockley II</u>.  The Court of Appeals in <u>Shockley II</u> reversed our decisions entered in accordance with <u>Shockley I</u>, in which we decided the period of limitations issue in favor of the Shockleys.  The parties agreed that these cases may be decided on the <u>Shockley</u> stipulations and evidentiary record previously considered by the Court of Appeals in <u>Shockley II</u>.  Petitioners have neither cited additional authority nor provided additional evidence to supplement the <u>Shockley</u> record in support of their argument.  The rationale of the Court of Appeals opinion applies equally to the notices sent to these petitioners.  We see no merit in a different result by revising the Court of Appeals' holding that the notices of transferee liability were timely.

[*24] II.  Transferee Liability

Petitioners assert that they are not liable as transferees for the debts of SCC under Federal and Wisconsin law.  Section 6901 does not independently impose tax liability upon a transferee but merely provides a procedure through which the IRS may collect unpaid tax--owed by a transferor of assets--from the transferee who received those assets.  Commissioner v. Stern, 357 U.S. 39, 42 (1958) (addressing section 311 of the Internal Revenue Code of 1939, the predecessor of section 6901).  Thus an independent basis for liability must be available, and this basis is generally found under applicable State law or equity principles.  Sec. 6901(a)(1)(A); Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961).

Accordingly, three requirements must be met for the Commissioner to assess transferee liability against a party under section 6901:  (1) the party must be subject to liability under applicable State law or equity principles, (2) the party must be a transferee under section 6901 pursuant to Federal law or equity principles, and (3) the transferor must be liable for the unpaid tax.  Swords Tr. v. Commissioner, 142 T.C. 317, 336 (2014); see Cullifer v. Commissioner, T.C. Memo. 2014-208, at *43, aff'd, 651 F. App'x 847 (11th Cir. 2016).  The Commissioner bears the burden of proving that a party is liable as a transferee of

[*25] the taxpayer's property but not of proving that the taxpayer is liable for the tax.  See secs. 6902(a), 7454(c); Rule 142(d).

The determinations of petitioners' substantive liability under State law and transferee status under Federal law are separate and independent determinations. See Feldman v. Commissioner (Feldman II), 779 F.3d 448, 458 (7th Cir. 2015), aff'g Feldman v. Commissioner (Feldman I), T.C. Memo. 2011-297; Salus Mundi Found. v. Commissioner, 776 F.3d 1010, 1012 (9th Cir. 2014), rev'g and remanding T.C. Memo. 2012-61; Frank Sawyer Tr. of May 1992 v. Commissioner, 712 F.3d 597, 605 (1st Cir. 2013), rev'g and remanding T.C. Memo. 2011-298; Starnes v. Commissioner, 680 F.3d 417, 429 (4th Cir. 2012), aff'g T.C. Memo. 2011-63.  We will consider whether petitioners are liable as transferees under State law before determining the application of section 6901.

A.  State Law Liability Requirement

As the transactions took place in Wisconsin, we use Wisconsin State law to determine whether petitioners are liable, as transferees, for the unpaid tax of SCC. See Commissioner v. Stern, 357 U.S. at 45.  Wisconsin has adopted the Uniform Fraudulent Transfer Act (WIUFTA), codified at chapter 242 of the Wisconsin Statutes.  See Wis. Stat. secs. 242.01 to 242.11 (2000).  WIUFTA defines "transfer" very broadly as "every mode, direct or indirect, absolute or conditional,

[*26] voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Id. sec. 242.01(12). Where a debtor transfers property to a transferee and thereby avoids creditor claims, WIUFTA provides creditors with certain remedies against the transferee. See id. sec. 242.07; see also id. sec. 242.01(3) ("'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."), (4) ("'Creditor' means a person who has a claim."), (6) ("'Debtor' means a person who is liable on a claim."). The Wisconsin Supreme Court has affirmed that WIUFTA reflects a strong desire to protect creditors. See Badger State Bank v. Taylor (Badger State Bank II), 688 N.W.2d 439, 448 (Wis. 2004), aff'g Badger State Bank v. Taylor (Badger State Bank I), 674 N.W.2d 872 (Wis. Ct. App. 2003).

Under WIUFTA transferee liability "is itself flexible and looks to equitable principles like 'substance over form,' just like the federal tax doctrines". Feldman II, 779 F.3d at 459. The Court of Appeals for the Seventh Circuit instructed that "Wisconsin has long followed the general rule that '[e]quity looks to substance and not to form'" and noted that WIUFTA explicitly incorporates

**[\*27]** equitable principles under Wis. Stat. sec. 242.10. Id. (quoting Cunneen v. Kalscheuer, 206 N.W. 917, 918 (Wis. 1926) (stating that equity "is loath to lend itself to the accomplishment of a purpose different from that which the transaction usually imports")); see Wis. Stat. sec. 242.10 ("Unless displaced by this chapter, the principles of law and equity * * * supplement this chapter."). Wisconsin courts appear to apply the substance over form doctrine in the same manner as Federal courts. See, e.g., Wis. Dep't of Revenue v. River City Refuse Removal, Inc., 712 N.W.2d 351, 363 n.19 (Wis. Ct. App. 2006) (stating that the substance over form principle governs the treatment of a taxpayer's activities and transactions for tax purposes while relying on Miller v. Tax Comm'n of Wis., 217 N.W. 568, 569 (Wis. 1928) (citing United States v. Phellis, 257 U.S. 156, 168 (1921)), for the proposition that "courts will look beyond the mere form to the substance of a transaction for the purpose of ascertaining its true nature"), aff'd, 729 N.W.2d 396 (Wis. 2007).

Under WIUFTA, creditors, such as respondent, have the burden to prove the elements of transferee liability by clear and convincing evidence. See Kaiser v. Wood Cty. Nat'l Bank & Tr. Co. (In re Loyal Cheese Co.), 969 F.2d 515, 518 (7th Cir. 1992); Mann v. Hanil Bank, 920 F. Supp. 944, 950 (E.D. Wis. 1996). There is no dispute regarding our prior opinion disregarding the form of the transactions

[*28] or our finding that in substance a transfer from SCC (the transferor) to SCC shareholders (the transferees) occurred. Instead respondent argues that petitioners failed to provide reasonably equivalent value to SCC and are therefore liable as transferees under Wis. Stat. sec. 242.05(1). Petitioners disagree and argue that by surrendering their right of redemption in exchange for the distributions they provided reasonably equivalent value to SCC.

> Wis. Stat. sec. 242.05(1) provides:
>
> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. [Emphasis added.]

Under this section, any transfer must be viewed exclusively from the perspective of the creditor--the degree of knowledge or beliefs or good faith of the putative transferees regarding the nature of the transfer are not relevant to the analysis. Subjective intent and good faith play no role in the application of WIUFTA's constructive fraud provisions. Feldman II, 779 F.3d at 459-460 ("[T]he shareholders' extensive emphasis on their due diligence and lack of knowledge of illegality is simply beside the point."); see also Badger State Bank II, 688 N.W.2d at 449 ("The transferee's subjective state of mind does not play a role in resolving

[*29] the present case under Wis. Stat. § 242.05(1)."); Badger State Bank I, 674 N.W.2d at 877 ("[T]he good-faith defense under [Wis. Stat.] § 242.08(1) applies only to claims made under Wis. Stat. § 242.04(1)(a)."). As a constructive fraud provision Wis. Stat. sec. 242.05(1) focuses on an objective result, meaning that there is no requirement that transferees be guilty of any fraud. Feldman II, 779 F.3d at 459 (citing Badger State Bank II, 688 N.W.2d at 447).

Whether reasonably equivalent value was received by the transferor is a question of fact. See Feldman I, slip op. at 38. While it does not define "reasonably equivalent", WIUFTA provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied". Wis. Stat. sec. 242.03(1); see also id. sec. 242.10; Feldman I, slip op. at 38 (explaining that the phrase "reasonably equivalent value" is derived from the fraudulent transfer provision of 11 U.S.C. section 548, and cases construing this provision offer additional guidance (citing Leibowitz v. Parkway Bank & Tr. Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998))). The "test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." Feldman I,

[*30] slip op. at 38-39 (quoting Barber v. Golden Seed Co., 129 F.3d 382, 387 (7th Cir. 1997)).

The record reflects that petitioners collectively received distributions of over $64 million from the SCC asset sale proceeds. In exchange for this petitioners claim to have surrendered their right of redemption along with their SCC stock. According to the express terms of the SCC shareholders' agreement petitioners' right of redemption vested immediately. However, this agreement limited petitioners' ability to exercise such right. The earliest date that petitioners could exercise their right of redemption was 6-1/2 years after its closing date-- approximately one year after the closing date of the SPA and NCAC APA. While the record in these cases extensively documents the negotiations leading up to the sale of SCC's assets, it is silent as to whether petitioners ever discussed surrendering their right of redemption at any point during that process. Furthermore, petitioners never discussed the specific value of their right of redemption let alone sought a formal valuation. This court has long declined to accord value to items incidental to a transaction that were "never actually dealt with as a separate item in the business transaction, never bargained for, [and] never evaluated." Payne v. Commissioner, 22 T.C. 526, 531 (1954) (holding that total consideration was paid for a newspaper's capital stock and the value of a

**[*31]** covenant not to compete was not bargained for and was incidental to the transfer of the newspaper's goodwill).

We conclude that petitioners' incidental surrender of their right of redemption as part of the transfer of their SCC shares constitutes neither value nor reasonably equivalent value. We have previously held that SCC received nothing in exchange, or, at best, received petitioners' shares of SCC stock, which--because of the distributions essentially liquidating SCC--were worthless. It follows under the facts presented here that petitioners' right of redemption was equally worthless. Thus, the deemed transferor SCC did not receive value, reasonably equivalent or otherwise, in exchange for the proceeds from the sale of its assets.

There is no dispute regarding SCC's liability for the Federal income tax arising from the asset sale, SCC's insolvency after the transfer, the existence of respondent's claim, or respondent's creditor status at the time of the transfers in question. Accordingly we conclude that petitioners are liable for such Federal income tax as SCC's transferees under Wisconsin State law.

Petitioners argue in the alternative an affirmative defense that they were good faith transferees under Wis. Stat. sec. 242.08(4) and therefore their liability must be reduced by the value they claim to have transferred to SCC. This section provides: "Notwithstanding voidability of a transfer or an obligation under this

[*32] chapter, a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to any of the following: * * * A reduction in the amount of the liability on the judgment." Wis. Stat. sec. 242.08(4)(c). In view of our holding that petitioners did not exchange value to SCC we need not consider whether petitioners were good faith transferees under Wis. Stat. sec. 242.08(4).

B. Federal Transferee Requirement

For purposes of section 6901, the term "transferee" includes, inter alia, donee, heir, legatee, devisee, distributee, and shareholder of a dissolved corporation. See sec. 6901(h); sec. 301.6901-1(b), Proced. & Admin. Regs. The principle of substance over form applies to determinations of transferee liability issues. See generally Scott v. Commissioner, T.C. Memo. 1998-426, aff'd, 236 F.3d 1239 (10th Cir. 2001). In accordance with the substance over form analysis we applied in Shockley III, petitioners, as distributees of SCC, are determined to be transferees pursuant to section 6901.

III. Penalty and Additions to Tax

Even if they may be held liable for SCC's unpaid tax, petitioners contend that the penalty and additions to tax asserted against SCC cannot be collected from them as its "transferee" under Wisconsin law. Specifically, petitioners argue that

[*33] the penalty and additions to tax are not "claims" that existed before SCC's deemed transfer of the proceeds from the sale of the company's assets, and therefore constructive fraud analysis under Wis. Stat. sec. 242.05(1) is not appropriate. Instead petitioners argue that in order to hold them liable as transferees for SCC's penalty and additions to tax the Commissioner must prove that: (1) SCC transferred the asset sale proceeds with actual intent to hinder, delay or defraud any of its creditors under Wis. Stat. sec. 242.04(1), and (2) petitioners (as transferees) had actual or constructive knowledge that SCC would not pay its obligations. According to petitioners' theory, respondent proved neither element and therefore failed to meet the burden of proof. Respondent disagrees with petitioners' arguments regarding the burden of proof.

Wis. Stat. sec. 242.04(1) provides:

A transfer made or obligations incurred by a debtor is fraudulent as to a creditor, <u>whether the creditor's claim arose before or after the transfer was made</u> or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (a) With actual intent to hinder, delay or defraud any creditor of the debtor; <u>or</u>

    (b) <u>Without receiving a reasonably equivalent value</u> in exchange for the transfer or obligation, <u>and</u> the debtor:

**[*34]**      1.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

     2.  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
     [Emphasis added.]

This section includes two possible methods for creditors to establish that a transfer was fraudulent:  actual fraud under Wis. Stat. sec. 242.04(1)(a) and constructive fraud under Wis. Stat. sec. 242.04(1)(b).  While each method is available to both present and future creditors, only the actual fraud method requires a creditor to prove that the debtor (transferor) acted with actual intent to hinder, delay, or defraud any creditor.  Id. sec. 242.04(1)(a).  The constructive fraud method requires the creditor to prove that the debtor did not receive reasonably equivalent value in exchange for the transfer and the transfer left the debtor with insufficient assets.  Id. sec. 242.04(1)(b).

Respondent has elected to hold petitioners liable as transferees for SCC's penalty, additions to tax, and interest under the constructive fraud method of Wis. Stat. sec. 242.04(1)(b).  Because this method is available to both present and future creditors, we need not address petitioners' arguments whether the penalty and additions to tax constitute present or future claims.  Id. sec. 242.04(1).  Under

**[*35]** the constructive fraud method of Wis. Stat. sec. 242.04(1)(b) respondent need not prove that SCC (the debtor) acted with actual intent to hinder, delay, or defraud the IRS. We have decided that SCC did not receive value, let alone reasonably equivalent value, for the transfer. See supra p. 31. Accordingly, respondent has met his burden to establish that petitioners are liable as transferees for the penalty and additions to tax asserted against SCC.

Petitioners incorrectly attempt to import the transferee's knowledge or belief into respondent's burden of proof. The plain text of Wis. Stat. sec. 242.04 focuses the inquiry on the debtor's (transferor's) knowledge or belief at the time of the transfer and not on that of the transferee. A transferee's good faith, knowledge, or reasonable belief is relevant only when considering affirmative defenses available to transferees under WIUFTA. See Wis. Stat. sec. 242.08 (defenses, liability, and protection of transferee); see also Feldman II, 779 F.3d at 459-460 (interpreting constructive fraud under Wis. Stat. secs. 242.04(1)(b) and 242.05). Petitioners bear the burden of proof when raising such defenses.

Petitioners' cited cases are not to the contrary. Each cited case involves an attempt to collect penalties and additions to tax arising from the transferor's posttransfer conduct either from transferees or successor transferees. Significantly, in each case requiring the Commissioner to prove actual fraudulent

[*36] intent the debtors (transferors) concluded the transfers to the transferees or successor transferees before engaging in the conduct that gave rise to the penalties and additions to tax. See Stanko v. Commissioner, 209 F.3d 1082, 1088 (8th Cir. 2000) (requiring Commissioner to prove fraudulent intent where transfer made approximately one year before transferee's ex-husband's company dissolved and subsequently failed to file a Federal income tax return giving rise to penalties), rev'g T.C. Memo. 1996-530; Buckrey v. Commissioner, T.C. Memo. 2017-138, at *11, *19-*20 (noting the Commissioner was required to prove fraudulent intent where penalties related to the transferor's engagement in a Son of BOSS tax shelter after, and unrelated to, the transfer to transferee shareholders); see also Frank Sawyer Tr. of May 1992 v. Commissioner, T.C. Memo. 2014-128 (finding trust was good faith transferee and limiting liability to the extent of value given to debtor), supplementing T.C. Memo. 2014-59; cf. Feldman II, 779 F.3d at 460 (finding shareholders liable for tax and penalties where "the [entire] transaction was premised on the assumption that the taxes would not be paid"), aff'g T.C. Memo. 2011-297; Tricarichi v. Commissioner, T.C. Memo. 2015-201, at *5-*6, *61-*63 (finding that transferee, who was company president and sole shareholder, engaged in intermediary transaction and was liable for taxes and penalties, and distinguishing Stanko as interpreting Nebraska law before adoption

**[\*37]** of Uniform Fraudulent Transfers Act), aff'd, 752 F. App'x 455 (9th Cir. 2018).

The facts in these cases are akin to those involved in <u>Tricarichi</u>. Petitioners held substantial percentages of the outstanding stock and were each represented on the SCC board. The SCC board considered the various sale options presented by Schmidt and ICA and elected to proceed with an intermediary transaction arranged by ICA. Petitioners were also represented throughout the transaction. Significantly the intermediary transaction could not have taken place without petitioners' consent. Even if the other SCC board members and shareholders had elected to proceed, they did not control a sufficient number of shares to compel petitioners to participate pursuant to the SCC shareholders' agreement drag-along provision. Similar to the transferee in <u>Tricarichi</u>, petitioners were full participants in SCC's conduct resulting in the penalty and additions to tax at issue. <u>See</u> <u>Tricarichi v. Commissioner</u>, at \*6-\*8.

Petitioners specifically challenge SCC's liability for an addition to tax under section 6651(a)(2). Respondent has conceded that SCC is not liable for an addition to tax under section 6651(a)(2). However, in doing so respondent attempts to assert in respondent's reply brief that SCC is liable for an addition to tax under section 6651(a)(3). On the basis of the record respondent's seriatim

**[\*38]** answering brief is the first instance where he asserted an addition to tax under section 6651(a)(3). None of the notices sent to SCC, the Shockleys, or petitioners include any reference to this addition. Respondent has not moved to file an amended answer to the complaint. New matters raised for the first time in brief will not be considered. Neither SCC nor petitioners are liable for additions to tax under either section 6651(a)(2) or (3).

We have considered petitioners' arguments relating to the remaining accuracy-related penalty under section 6662(a), addition to tax under section 6651(a)(1), and interest, and they are moot, irrelevant, or without merit. Petitioners are liable for the remaining penalty and addition to tax. We conclude that petitioners' liability for interest is to be calculated in accordance with our decision in <u>Shockley IV</u>.

We have considered all of the parties' arguments, and, to the extent not addressed above, we conclude that they are moot, irrelevant, or without merit. To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.